UNITED STATES of America ex rel.
Mamdouh BARBOUR, Petitioner-
Appellant,

v.

DISTRICT DIRECTOR OF the IMMI-
GRATION AND NATURALIZATION
SERVICE, SAN ANTONIO, TEXAS,
etc., Respondent-Appellee.

No. 73-1411.

United States Court of Appeals,
Fifth Circuit.

March 21, 1974.

Jack Wasserman, Benjamin M. Parker, Washington, D. C., Ruben Montemayor, San Antonio, Tex., for petitioner-appellant.

C. J. Calnan, Asst. U. S. Atty., William S. Sessions, U. S. Atty., San Antonio, Tex., Donald H. Feige, Atty., John L. Murphy, Chief, Government Regulations Section, Crim.Div., James P. Morris, Dept. of Justice, Washington, D. C., for respondent-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

In this tangled case we review the denial of a petition for a writ of habeas corpus to an alien who was refused release on bail pending a final decision in deportation proceedings. A Special Inquiry Officer denied bail to the petitioner, Mamdouh Barbour, an alien, on the ground that he was a bad bail risk. On appeal the Board of Immigration Appeals did not rule on the question whether Barbour was a bad bail risk but, on information submitted by the State Department, denied bail on the ground that Barbour represented a threat to national security. Barbour then petitioned for a writ of habeas corpus in federal court. After reviewing *in camera* confidential information relating to national security, the district court stated that "for the record" Barbour was not a security risk, but was a bail risk. The court denied the petition for habeas corpus. We agree with the result: detention of this petitioner without bail is lawful.

Barbour is a citizen of Syria, a Major in the Syrian Army. On February 10, 1972, he left Syria, went to Lebanon, then to Turkey, and eventually entered Canada on February 19, 1972. In Canada he deposited approximately $115,000 in four different banks. There, Barbour applied for a non-immigrant visa and was granted permission to enter the United States. In support of his application for the visa, Barbour submitted a fraudulent passport issued by the Imamate of Oman State to Yousef S. Risk, showing that he was a native of Lebanon and a citizen of Jordan. He crossed the border from Canada into the United States on March 4, 1972.

Subsequent to Barbour's entry into this country, the Syrian Government, through Interpol, informed United States' authorities of Barbour's true identity and also of an arrest warrant issued in Syria against him for escape abroad, violation of military instructions, and misappropriation and smuggling of two million Syrian pounds—the equivalent of approximately $450,000. The Immigration and Naturalization Service apprehended Barbour on May 24, 1972, in Arlington, Texas, and began deportation proceedings.

The Syrian Government contends that as vice-head of the finance and adminis-

trative department of his army unit Barbour embezzled the funds and, fearing that the theft would be discovered upon his imminent change of assignment, fled the country. Barbour disputes these contentions. He insists that he left Syria with no more than $131,000, most of it inherited from his father, the rest representing the proceeds from his property in Syria. He contends that $115,000 is now frozen by court order in Canadian banks at the instance of Syrian authorities and that he has spent almost all of the remainder. He also contests the Syrian version of the circumstances under which he fled the country. He maintains that he was imprisoned under barbarous conditions for 45 days beginning in 1971 for refusing to give information to a Soviet army officer. Although he was promoted from Captain to Major after this incident, allegedly he was given a dangerous assignment with SAIQA. SAIQA is the Syrian supported military arm of the Palestinian resistance and is said to have connections with world-wide terrorist organizations. Barbour asserts that he tried to resign from the army but that his resignation was not accepted; that he was never involved with SAIQA or in sympathy with that organization, and was assigned to it as a punishment. Finally, Barbour maintains that he is a member of the Druse sect that exists in Syria and Israel, and is persecuted in Syria; that rumors are being spread in Syria that he is pro-Israel and anti-Soviet; that his father was killed for his opposition to the Syrian Government; and that, because like his father he opposes the Government, he fears that if returned to Syria he will be executed for his political beliefs. The Immigration and Naturalization Service takes a skeptical attitude toward Barbour's explanation, because he was promoted to Major after the episode with the Soviet officer and because he sought asylum only after he was arrested. Although the $115,000 in Canada is frozen, there is still $335,000 to be accounted for, as-

suming the correctness of the Syrian Government's figures.

The procedural history of Barbour's case since he was taken into custody has been a roller coaster ride of motions, denials, and appeals. He has applied for political asylum and sought to have deportation withheld, arguing that if deported to Syria he faces persecution. Twice the Office of Refugee and Immigration Affairs of the State Department has advised that a case for persecution has not been made. Twice a Special Inquiry Officer (now an Immigration Judge) has determined the persecution issue against Barbour and has ordered him deported. The Board of Immigration Appeals has entertained this issue once. According to the record before us, no "final order of deportation" within the meaning of Section 242(c) and (d) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1252(c) & (d), has yet been rendered. See 8 C.F.R. 242.20 (1973) and 8 C.F.R. 243.1 (1973).

Special Inquiry Officers have twice dealt with the issue raised in this case —the legality of continuing Barbour in custody without bail. A custody hearing was held before a Special Inquiry Officer on June 6, 1972. At the close of the hearing the Officer ruled against permitting Barbour to be released on bail:

"I am going to order that the change in custody be denied at this time. The record shows the respondent has used different identities, fraudulent documents. He does not have any close relatives or property in the United States, although it was pointed out that the money that he has in banks might be held in some way, and he would not leave his money, but then of course we do not know at this time how many other banks he might have money in in other countries and what the risk is, and I would hesitate today in setting what I consider to be an intelligent bond in the case for his release under bond. I wouldn't know whether to make it a thousand dollars or a hundred thou-

sand, and because of the indication that we will be able to proceed with a prompt hearing and at that time know more concerning all the matters in the case, I am going to order that the request for a change in status be denied."

This custody determination was reconsidered and affirmed on October 5, 1972, by another Special Inquiry Officer, who stated: "[T]here appears to be no justifiable reason for releasing the\ respondent or making a change in his custody status while the question of his deportability is pending before the Board of Immigration Appeals."

Barbour appealed the October 5 determination to the Board of Immigration Appeals. In the argument before the Board on October 17, 1972, the issue was whether Barbour represented a bail risk. Counsel for the Immigration and Naturalization Service conceded at that time that Barbour did not represent a security risk. On October 27, 1972, while the case was under advisement, the Board received correspondence, including classified information, from the State Department recommending that Barbour not be set free on bail. On the basis of this new information, the Board held on November 24, 1972, that Barbour's release from custody would endanger the national security of the United States. Barbour's appeal was dismissed on this ground which, of course, he had no opportunity to contest and could not anticipate since the argument had centered on whether Barbour was a bail risk. The Board declined to rule on the bail risk issue, stating: "At best it is questionable whether this respondent is a good bail risk or not."

Barbour petitioned for a writ of habeas corpus. The classified national security information on which the Board of Immigration Appeals had based its

decision was forwarded to the district court. The district judge viewed the information *in camera* and found that those documents and the record failed to establish that Barbour represented a security risk. A review of the record as a whole, however, convinced the district court that the evidence upon which the Special Inquiry Officers based their decisions established that Barbour was not a good bail risk. The court considered the following factors in denying bail. (1) Barbour was in the country illegally. (2) He had deceived the American Consul in his application for a non-immigrant visa and had assumed a false name. (3) He had entered the United States surreptitiously and revealed himself as a person "likely to conceal himself within the society". (4) In fact, he had concealed himself within the society. (5) He had no family or roots in the United States. (6) He had no employment record here. (7) He was charged with embezzling more than $450,000 from the Syrian Army, (8) desertion from the Syrian Army, and (9) smuggling money abroad. (10) A substantial amount of cash was unaccounted for which might be used to help Barbour abscond. On these findings the district court concluded that there was substantial evidence to support the Special Inquiry Officers' determination. Accordingly the court denied the writ of habeas corpus.

 If the Board had adopted the findings of the Special Inquiry Officers, this Court would have to agree that the evidence supports the holding that Barbour was a bail risk. But the Board pitched its decision on its conclusion that Barbour was a security risk.[1] The district court's holding, therefore, collides with the principle that the issue for judicial review of an agency's action is the issue decided by the agency. S.

1. We note that in further proceedings initiated by Barbour during the pendency of this appeal the Board has reconsidered the bail risk issue. On October 2, 1973, based on an augmented record, the Board declared that "in light of all the evidence adduced in the bond and [persecution] proceedings, and for the reasons given by the District Court in its decision on the earlier request for release on bond, we find that the respondent is also a bail risk".

E. C. v. Chenery, 1943, 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed.1995. As this Court stated in N. L. R. B. v. Clark, 5 Cir. 1972, 468 F.2d 459, 467:

"It is well settled that the reasons actually advanced by an administrative agency are the only reasons properly considered by a court in determining the legality of the agency's action."

In reviewing the decision of the district court, however, we are not so restricted by its grounds of decision. See Jaffke v. Dunham, 1957, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314; Texaco, Inc. v. Holsinger, 10 Cir. 1964, 336 F.2d 230, 233, cert. denied, 379 U.S. 970, 85 S.Ct. 669, 13 L.Ed.2d 563. After viewing the information forwarded to this Court with regard to national security, we hold that the district court was wrong in its belief that the Board erred in finding that Barbour was a security risk. Thus we affirm the district court on the ground that Barbour represents a threat to the security of this country. We do not reach the bail risk question.[2]

 It is not altogether clear on what basis the district court found "for the record" that Barbour did not present a threat to national security. It does seem from our view of the evidence, however, that in reaching that conclusion the court must have used an overly severe standard of review.[3] The Immigration and Naturalization Act of 1952 vests wide discretion in the Attorney General and his delegates to determine whether or not to release an alien on bail pending a final decision in deportation proceedings. Section 242(a) of the Act provides in pertinent part:

"Pending a determination of deportability in the case of any alien . . . , such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into custody may *in the discretion of the Attorney General*, and pending such final determination of deportability, (1) be continued in custody; or (2) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (3) be released on conditional parole."

8 U.S.C.A. § 1252(a). (Emphasis supplied.[4]) The wording in Section 242 (a) is virtually identical to that in Section 23 of the Internal Security Act of 1950. In reviewing the legislative history of the earlier Act, the Supreme Court said: "[T]he language of the reports is emphatic in explaining Congress' intention to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse. . . . [The discretion of the Attorney General] can only be overridden where it is clearly shown it 'was without reasonable foundation' ". Carlson v. Landon, 1952, 342 U.S. 524, 540–541, 72 S.Ct. 525, 534, 96 L.Ed. 547, quoting United States ex rel. Potash v. District Director, 2 Cir. 1948, 169 F.2d 747, 751. Courts that have reviewed decisions denying aliens bail since the 1952

---

2. We note in passing, however, that one who is a danger to national security may for that reason be a bad bail risk.

3. The district court apparently used the standard enunciated in section 106 of the Immigration and Nationality Act, that "the Attorney General's findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive". 8 U.S.C. § 1105a(a)(4). This standard is explicitly applied to "judicial review of all final orders of deportation" and to certain determinations concerning nationality. There is no evidence from either the text of the Section or the legislative history,

H.R.Rep.No.1086, 87 Cong.1st Sess., 1961, U.S.Code Cong. & Admin.News pp. 2950, 2966–2977, that Congress intended to overrule the more stringent standard established by the Supreme Court in Carlson v. Landon, 1952, 342 U.S. 524, 540–541, 72 S.Ct. 525, 96 L.Ed. 547, for bail cases. See infra.

4. The Attorney General is granted broad discretion to delegate his duties and powers under the Act. See 8 U.S.C. § 1103(a). The Attorney General has delegated virtually all his powers under Section 242(a) to the Board of Immigration Appeals. 8 C.F.R. 3.1(d) (1973). See infra.

Act have, apparently unanimously, transferred the presumption to cases under that Act. See, e. g., United States ex rel. Belfrage v. Shaughnessy, 2 Cir. 212 F.2d 128 at 129; Application of Maringolo, S.D.N.Y.1969, 303 F.Supp. 1389, 1392. Under Section 242(a), therefore, an alien has a heavy burden to establish that the Attorney General abused his discretion. See United States ex rel. Nukk v. District Director, 2 Cir. 1953, 205 F.2d 242, 244. The test established in the *Carlson* case is, we think, essentially that typically used in habeas corpus review of administrative action—whether there is any basis in fact for the agency's decision. See Developments in the Law—Habeas Corpus, 83 Harv.L.Rev. 1038, 1238–63 (1970). Here the evidence more than adequately supports the Board's finding that Barbour is a security risk.

■ There is no question of the Attorney General's discretion under Section 242(a) of the Act to continue an alien in custody during deportation proceedings upon a properly-made determination that the release of an alien would be a danger to the national security of the United States. Carlson v. Landon, supra. Barbour contests, however, the manner in which that determination was reached by the Board. Barbour argued in his petition for habeas corpus, and he argues before this Court, that he was denied due process of law when the security risk information was presented ex parte to the Board without his having an opportunity to refute it. He contends also that the Board had no authority to consider evidence not presented to the Special Inquiry Officer; nor did it have authority to consider confidential information in connection with bail. He argues that the Board could not decide the issue of Barbour's being a national security risk when the issue at the hearing, as conceded by the Immigration and Naturalization Service, was solely whether Barbour was a bail risk.

■ We reject these contentions. Discretionary relief—and release on bail is a form of discretionary relief—may be denied on the basis of confidential information, the disclosure of which would be prejudicial to the public interest, safety, or security, if the use of such information is sanctioned by regulations. Jay v. Boyd, 1956, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242; United States ex rel. Dolenz v. Shaughnessy, 2 Cir. 1953, 206 F.2d 392, 394–395. Regulations specifically provide that "[t]he determination of the special inquiry officer as to custody status or bond may be based upon any information which is available to the special inquiry officer, or which is presented to him by the alien or the Service". 8 C.F.R. 242.2(b) (1973). Regulations also direct the Board of Immigration Appeals to "exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case." 8 C.F.R. 3.1(d) (1973). The Board therefore, may base its decision on any information available to it.

Affirmed.