**Alceu BARTHOLOMEU**

**v.**

**DISTRICT DIRECTOR, IMMIGRATION & NATURALIZATION SERVICE.**

**Civ. No. K–79–1765.**

United States District Court,
D. Maryland.

Feb. 7, 1980.

**316**

David Carliner, and Robert A. Remes, Carliner & Gordon, Washington, D. C., and Harold P. Dwin, Baltimore, Md., for plaintiff.

Russell T. Baker, Jr., U. S. Atty., and John F. Hyland, Jr., Asst. U. S. Atty., Baltimore, Md., for defendant.

1. 8 U.S.C. § 1251(a)(11) provides in relevant part:

Any alien in the United States * * * shall, upon the order of the Attorney General, be deported who—

(11) is, or hereafter at any time after entry has been, a narcotic drug addict, or who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation

FRANK A. KAUFMAN, District Judge.

In this habeas corpus action, Alceu Bartholomeu, petitioner, currently confined in the Baltimore City Jail, seeks release from custody pending a decision by the United States Court of Appeals for the District of Columbia Circuit as to whether petitioner should be deported from the United States.

Bartholomeu, a native and citizen of Brazil, was admitted into the United States as a lawful permanent resident on May 25, 1963. More than eight years later, on October 28, 1971, he was convicted of possession of heroin by a New Jersey state court, and received a suspended sentence of two to five years in the state prison, three years probation, and a $25.00 fine. Subsequently, on December 11, 1974, Bartholomeu was convicted of conspiracy to possess marijuana in a Maryland state court and sentenced to one year confinement.

On July 17, 1975, the Immigration and Naturalization Service (INS) instituted deportation proceedings against petitioner pursuant to 8 U.S.C. § 1251(a)(11)[1] based upon his 1971 heroin conviction. On August 1, 1975, Bartholomeu was found deportable by an Immigration Judge and ordered deported to Brazil. Apparently, as a narcotics offender, petitioner was not deemed eligible for any discretionary relief from deportation. Thereupon, Bartholomeu timely appealed to the Board of Immigration Appeals. On February 27, 1976, that Board dismissed the appeal. Thereupon, Bartholomeu was instructed by the INS to present prepaid, confirmed travel arrangements to Brazil to the District Director of the INS at Baltimore, Maryland by March 15, 1976 for his departure from the United

governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, or exportation of opium, coca leaves, heroin, marihuana, any salt derivative or preparation of opium or coca leaves or isonipecaine or any addiction-forming or addiction-sustaining opiate; * * *.

States by March 22, 1976. Instead, Bartholomeu moved for a stay of deportation until December 31, 1976.

On June 2, 1976, Bartholomeu's application for that stay was denied. At or close to that latter date, the INS apparently sent a further notice to petitioner by certified mail, ordering him to report for deportation immediately. That notice was, however, returned unopened to the INS. According to its procedures, the INS also mailed a copy of that notice to petitioner's then attorney, who notified petitioner by letter that petitioner's request for a stay had been denied. Petitioner has stated by affidavit, however, that he does not recall being specifically told by his attorney to report at any set time for deportation. Petitioner's attorney again wrote a letter to his client in July, 1976 in which that attorney requested Bartholomeu to contact him. Bartholomeu did not respond to either of the above-mentioned letters, seemingly because he was dissatisfied with the representation he was then receiving and because he "didn't feel anything more could be done on [his] case."

On December 14, 1976, the INS sent petitioner, by certified mail, return receipt requested, a notice to report for deportation at Baltimore, Maryland on December 20, 1976. That notice was returned to the Service unclaimed. A copy of the December 14, 1976 deportation notice was also mailed to petitioner's attorney. That attorney did not notify Mr. Bartholomeu with regard to the December 14, 1976 order, apparently because the attorney had not received any response from Bartholomeu to his earlier letters and had lost contact with his client. In any event, petitioner failed to appear for deportation on December 20, 1976.

Petitioner's whereabouts remained unknown to the INS for over 2½ years. On July 11, 1979, he was arrested by INS officers at Baltimore, Maryland and placed in custody in the Baltimore City Jail. He has been retained in custody since that date.

On July 12, 1979, petitioner filed a motion to reopen his deportation proceedings before the Board of Immigration Appeals, relying upon two cases which had been decided since his initial deportation proceeding.[2] The Board of Immigration Appeals denied that motion on August 2, 1979. Thereafter, Bartholomeu timely sought review of that denial in the United States Court of Appeals for the District of Columbia Circuit. Pursuant to 8 U.S.C. § 1105a(a)(3),[3] the deportation of petitioner has been stayed pending determination by the Court of Appeals.

On two different occasions, after he filed his said appeal, petitioner unsuccessfully requested the INS to release him from custody pending disposition by the Court of Appeals. Subsequently, on September 21, 1979, Bartholomeu instituted the within habeas corpus case, contending that under section 242(c) and (d) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1252(c) and (d), he must be released.

Section 242(c)[4] provides in relevant part: When a final order of deportation under administrative processes is made against any alien, the Attorney General shall have a period of six months from the date of such order, or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States, during which period, at the Attorney General's discretion, the alien may be detained * * *. * * * If deportation has not been practicable, advisable, or possible, or departure of the alien from

**2.** *See Francis v. Immigration and Naturalization Service*, 532 F.2d 268 (2nd Cir. 1976), and *Matter of Silva*, Interim Decision 2532 (BIA September 10, 1976). *See also Matter of Marin*, Interim Decision 2666 (BIA August 4, 1978). Copies of the *Silva* and *Marin* decisions have been placed in the court file in this case.

**3.** 8 U.S.C. § 1105a(a)(3) provides in relevant part:

The service of the petition for review upon such official of the [INS] shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs; * * *.

**4.** 8 U.S.C. § 1252(c).

the United States under the order of deportation has not been effected, within such six-month period, the alien shall become subject to such further supervision and detention pending eventual deportation as is authorized in this section.[5]

Section 242(d) [6] provides in relevant part: Any alien, against whom a final order of deportation as defined in subsection (c) of this section heretofore or hereafter issued has been outstanding for more than six months, shall, pending eventual deportation, be subject to supervision under regulations prescribed by the Attorney General.

The six month period set forth in § 242(c) initially began to run in this case on February 27, 1976, when the Board of Immigration Appeals entered its final order of deportability. At and since that time, the INS seemingly has made every effort to effect petitioner's departure from the United States. Petitioner was initially scheduled to be deported on March 22, 1976, but succeeded in having his departure date postponed by moving for a stay of deportation. After petitioner's application for a stay of deportation was denied, the INS again attempted to deport Bartholomeu in June, 1976. While petitioner maintains that he did not receive a notice to report for deportation in the summer of 1976, he does admit that he received a letter from his attorney indicating that his application for stay had been denied. Under those circumstances, petitioner must have realized that his scheduled deportation was imminent and that accordingly he was, at the very least, under an affirmative duty to keep in contact with his attorney so as to have up-to-date knowledge concerning the date of his scheduled deportation. When petitioner was finally arrested by the INS in July, 1979, he was placed in custody for the first time. Of course, six months had long since passed since the issuance of the order for his deportation. Petitioner herein contends that that fact deprives the Attorney General of his authority, under Section 242(c), presently to detain him in custody.

In *United States ex rel. Cefalu v. Shaughnessy*, 117 F.Supp. 473 (S.D.N.Y.), *aff'd on opinion below*, 209 F.2d 959 (2d Cir. 1954), in the course of denying an alien's quest for habeas corpus relief, then district judge Irving R. Kaufman wrote (at 474):

It is inconceivable, as urged by the relator, that Congress intended when it stated that

"the Attorney General shall have a period of six months from the date of such order or, if judicial review is had, then from the date of the final order of the court, within which to effect the alien's departure from the United States * * * *"

that a relator, who has been delayed beyond the six months period, not by reason of any conduct on the part of the Attorney General or his inability to effect the alien's departure, but solely by reason of the conduct of the alien's own counsel in utilizing writs in another proceeding (assuming the good faith of the writs) could thus thwart the execution of the order of deportation and in addition claim his release from the custody of the Immigration officials by reason of the passage of the six months period. The statute expressly provides that the Attorney General "shall have a period of six months" within which to effect an alien's deportation. In view of the writs issued out of this Court, the Attorney General was prevented from effecting the deportation and a fortiori he never "had" his period of six months.

\* \* \* \* \* \*

---

**5.** The question of whether, *after* the six-month period has expired, the alien may be detained in custody, or must be released subject only to supervision, *see Shrode v. Rowoldt*, 213 F.2d 810 (8th Cir. 1954); *United States ex rel. Blankenstein v. Shaughnessy*, 117 F.Supp. 699 (S.D.N.Y.1953); *United States ex rel. Lee Ah Youw v. Shaughnessy*, 102 F.Supp. 799 (S.D.N.Y. 1952), need not be reached in this case because, as discussed *infra* in the body of this opinion, this Court concludes that the Government is entitled to a period of six "unhampered" months which it has not had in this case.

**6.** 8 U.S.C. § 1252(d).

Congress clearly intended that the Attorney General have six unhampered months within which to effect deportation, for it is provided in Section 1252(c) that "if judicial review is had, then from the date of the final order of the court * * * " shall the six months period commence to run.

*United States ex rel. Lam Tuk Man v. Esperdy,* 280 F.Supp. 303 (S.D.N.Y.1967) involved an INS deportation order issued on October 11, 1965. In that case the alien succeeded in delaying his deportation for close to two years, *i. e.,* until April 24, 1967, by instituting various judicial proceedings. After that time, arrangements were made for his deportation and he was taken into custody, pursuant to Section 242(c), on August 2, 1967. On August 3, 1967, the alien applied for a stay of deportation. On that same day, *i. e.,* August 3, 1967, even before his request for a stay of deportation had been denied, the alien also filed a petition for review of the denial of his application for a stay in the Court of Appeals. The filing and serving of the review petition had the effect of staying the alien's deportation.[7] On August 8, 1967, the INS denied the alien's motion to reopen his deportation proceedings. The alien at once indicated that he intended to appeal that decision—a process which, he contended, would involve considerable delay—and requested that he be released on bail pending that review. After that bail request was denied by INS, the alien brought suit in federal district court challenging the denial of bail, contending, *inter alia,* that his detention was unlawful.

In ruling that the Attorney General had the authority to detain the alien in custody pursuant to Section 242(c), Judge Motley wrote (at 304):

> * * * [T]hough it is true that Section 242(c) of the Immigration and Nationality Act, 8 U.S.C. § 1252(c) limits the At-

torney General's authority to detain an alien after a six months period following the entry of an order of deportation, the period has been extended where the delay in effecting deportation arose not from any dalliance on the part of the Attorney General but from the alien's own resort to a multiplicity of judicial proceedings to delay or avoid his deportation. See, *United States ex rel. Cefalu v. Shaughnessy,* 117 F.Supp. 473 (S.D.N.Y.1954), aff'd on opinion below, 209 F.2d 959 (2d Cir. 1954). * * *

Here, all delays in executing the order of deportation are attributable to the relator. Under the law as it now stands in this Circuit, relator's challenge to the lawfulness of his detention pursuant to a deportation order that is more than 6 months old must fail.[8]

Bartholomeu was scheduled to be deported back in 1976. Any delays in that scheduled deportation are attributable solely to Bartholomeu's own actions. When petitioner was finally apprehended in July, 1979, the INS had the authority to detain him in custody pursuant to Section 242(c). The six month detention period provided for in Section 242(c) began to run on July 11, 1979. Thus, but for petitioner's efforts to reopen his deportation proceeding and his subsequent filing of a Petition for Review in the Court of Appeals, he would have been entitled to be released from custody on January 11, 1980 if the Immigration authorities had not by that date effected his departure from the United States.

■ By instituting proceedings in the Court of Appeals, however, petitioner once again interrupted the Attorney General's efforts to effect his deportation. As Judge Motley recognized in the *Lam Tuk Man* case, where the alien seeks to avoid his deportation by resort to various judicial

---

7.  *See* n. 3 *supra.*

8.  While ruling that the Attorney General had the power to detain the alien in custody under Section 242(c), Judge Motley went on to hold (at 304–05) that, under the circumstances, denial of bail was unreasonable and an abuse of

discretion. The alien had several business matters to take care of prior to his deportation and there was no indication that he would not show up for deportation at the appointed time if released on bail.

proceedings, the six month period provided for in Section 242(c) is extended and the alien cannot secure his release from custody when, due to his own actions, he has been detained pursuant to a deportation order that is more than six months old. As Judge Kaufman noted in *Cefalu* (at 474), the provisions of Section 242(c) were intended to give the Attorney General "six *unhampered* months within which to effect deportation." (Emphasis added) In this case, as in *Cefalu* and in *Lam Tuk Man*, due first to petitioner's failure to report for deportation in 1976 and later to his efforts to avoid his deportation through judicial proceedings, the Attorney General has never had his unhampered and unimpeded six-month period.

The Congress, as Judge Motley concluded in *Lam Tuk Man*, hardly intended to deprive the Attorney General of all authority to arrest and detain an alien during the interval between the final administrative deportation order and the final order of the court. Indeed, it would seem senseless for Congress to have provided that where, as here, the alien who has failed to appear for deportation is arrested and confined to insure that he will in the future appear for possible deportation, such an alien may secure his release from custody merely by seeking judicial review. Nonetheless, it must be admitted that the language of section 242(c) is not as clear as it could be. It is possible to contend, despite the common sense conclusions reached in *Cefalu* and *Lam Tuk Man*, that the six-month period in section 242(c) commences to run from the date of the INS deportation order and again from the date of the final court order, that there is no tolling brought about by the petitioner's own conduct, and that there is no tolling during the pendency of an appeal to a court after the INS order. Indeed, all or parts of those conclusions were seemingly accepted in *Rubinstein v. Brownell*, 92 U.S.App.D.C. 328, 206 F.2d 449 (D.C. Cir. 1953), *aff'd per curiam by an equally divided court*, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954).

*Rubinstein* involved a deportation order issued by the Attorney General concerning an alien who had been convicted of filing false affidavits in an attempt to evade the draft. Pursuant to that deportation order, the INS ordered the alien's arrest. The alien, in addition to seeking judicial review of the deportation order, brought suit in the district court seeking injunctive relief to restrain the Government from arresting and detaining him pending disposition of his petition for review. The district court denied the request for injunctive relief and the alien appealed to the D.C. Circuit.

On appeal, the Government relied on section 242(c). The Court, however, was unpersuaded, stating (92 U.S.App.D.C. at 334, 206 F.2d at 455):

> To justify the proposed arrest the appellee relies on § 242(c) of the 1952 Act. We think it inapplicable. The six-month period during which § 242(c) gives the Attorney General discretion to detain an alien who has been ordered deported begins to run "if judicial review is had, then from the date of the final order of the court". There has not yet been a final order of the court. The purpose of the detention authorized by § 242(c) is "to effect the alien's departure from the United States". All agree that departure cannot be effected while the deportation order is under review.

However, after so indicating that section 242(c) was inapplicable, Judge Edgerton concluded that the Attorney General had the authority to detain the alien in custody pending judicial review pursuant to section 242(a), 8 U.S.C. § 1252(a), which provides in relevant part:

> Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody * * *.

As to that statutory provision, Judge Edgerton wrote (92 U.S.App.D.C. at 334, 206 F.2d at 455):

The appellee does not rely on § 242(a), which relates primarily to the period before a final administrative deportation order is issued. Read literally, it may relate only to that period. But Congress can hardly have meant to give the Attorney General no authority to arrest the alien, in any circumstances, during the present interval between the final administrative deportation order and the final order of the court. To avoid such a gap in the statute, we read the arrest provisions of § 242(a) as applicable during this interval.

■ While this Court prefers to rely upon section 242(c), in agreement with *Cefalu* and *Lam Tuk Man* and in disagreement with *Rubinstein*, rather than section 242(a), it would, if required, also rely upon section 242(a) for the reasons set forth in *Rubinstein*. Accordingly, this Court concludes that Bartholomeu may be detained by the Government under either or both of subsections (a) and (c) of section 242.

■ There remains the question of whether, pursuant to section 242(c) and/or section 242(a), the Attorney General has proceeded "with such reasonable dispatch as may be warranted by the particular facts and circumstances * * *." Those words, which appear in both of those subsections of section 242, do not restrict habeas corpus review solely to the situations in which the Attorney General has failed to proceed with "reasonable dispatch." Thus, as Judge Chase stated in *United States ex rel. Yaris v. Esperdy*, 202 F.2d 109, 112 (2d Cir. 1953), in discussing section 242(a):

In the absence of clear language to the contrary, we cannot construe the statute to give the Attorney General unbridled license to exercise his discretion as to detention in whatever arbitrary or capricious way he might see fit, provided only that he act with reasonable dispatch to obtain a decision as to the alien's deportability. On the contrary, we think his discretion as to keeping an alien in custody is judicially reviewable to the same extent it was before. Section 242 provides but an added statutory recognition

of a basis for judicial review, not a limitation upon the power as it had existed. *See also Rubinstein v. Brownell, supra*, 92 U.S.App.D.C. at 332 n. 14, 206 F.2d at 453 n. 14; *United States ex rel. Blankenstein v. Shaughnessy*, 117 F.Supp. 699, 702 (S.D.N.Y.1953).

■ Nevertheless, the standard of review of the Attorney General's determination in a case such as this one is a deferential standard. *See United States ex rel. Barbour v. District Director of I. & N. S.*, 491 F.2d 573 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). In that case, Judge Wisdom put it this way (at 577–78):

* * * The wording in Section 242(a) is virtually identical to that in Section 23 of the Internal Security Act of 1950. In reviewing the legislative history of the earlier Act, the Supreme Court said: "[T]he language of the reports is emphatic in explaining Congress' intention to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse. . . . [The discretion of the Attorney General] can only be overridden where it is clearly shown it 'was without reasonable foundation'". *Carlson v. Landon*, 1952, 342 U.S. 524, 540–541, 72 S.Ct. 525, 534, 96 L.Ed. 547, quoting *United States ex rel. Potash v. District Director*, 2 Cir. 1948, 169 F.2d 747, 751. Courts that have reviewed decisions denying aliens bail since the 1952 Act have, apparently unanimously, transferred the presumption to cases under that Act. See, e. g., *United States ex rel. Belfrage v. Shaughnessy*, 2 Cir., 212 F.2d 128 at 129; *Application of Maringolo*, S.D.N.Y.1969, 303 F.Supp. 1389, 1392. Under Section 242(a), therefore, an alien has a heavy burden to establish that the Attorney General abused his discretion. See *United States ex rel. Nukk v. District Director*, 2 Cir. 1953, 205 F.2d 242, 244. The test established in the *Carlson* case is, we think, essentially that typically used in habeas corpus review of administrative action—whether there is any basis in fact for the agency's decision. See

322

Developments in the Law—Habeas Corpus, 83 Harv.L.Rev. 1038, 1238–63 (1970).

\* \* \* \* \* \*

■ The Attorney General's decision to detain Bartholomeu is hardly "without a reasonable foundation." In a letter to counsel for petitioner dated September 10, 1979, the District Director set forth the grounds for his decision to detain petitioner in custody, as follows:

> A careful and thorough review has been made in this case, and all factors have been considered. This subject has no substantial ties in the community, has been convicted of several drug-related violations, failed to report for deportation and absconded from Immigration Service authorities. It was not until he was finally located and arrested on July 11, 1979 that he made any applications to the Service.

Bartholomeu has submitted several affidavits concerning his alleged substantial ties in the community. The record indicates that, prior to his arrest in July of 1979, Bartholomeu had worked for nearly three years as a parking attendant and cashier for a parking lot company in Washington, D. C. and had established, during that period, a stable common-law relationship with a woman with whom he had been living. However, even assuming that these facts add up to "substantial ties in the community," the remaining grounds cited by the District Director amply support his decision to detain petitioner.

Bartholomeu failed to report for his scheduled deportation in December, 1976 and remained at large for over 2½ years until arrested by the INS authorities. As noted *supra*, the INS initially attempted to deport the petitioner in June, 1976, after his request for a stay of deportation had been

denied. Even though he received notice from his attorney that his petition for stay had been denied, Bartholomeu failed to keep in touch with his attorney in order to ascertain the date of his scheduled deportation and, indeed, failed to answer any of the letters from his lawyer. Bartholomeu's failure to report for deportation in either June or December, 1976 cannot be excused by the fact that he may not have received the deportation notices which were sent both to him and his attorney. That is because any such failure was attributable solely to his own failure to contact his attorney.

In an affidavit submitted in this case, petitioner indicates that he did not respond to the letters from his attorney in the summer of 1976 because he "didn't feel anything more could be done on [his] case." That means that petitioner should have realized that since his stay of deportation had been denied in June, 1976, he had no alternative but to report for deportation to Brazil. Instead, he failed to surrender for deportation and remained a fugitive until arrested in July, 1979.[9] Given those facts, there is ample evidence to support the District Director's conclusion that a determination to free Bartholomeu from detention would pose a substantial risk of his flight and a substantial risk that he would fail to report for deportation if he were presently set free and the Court of Appeals later denied his appeal. In sum, the petitioner has failed to establish that the decision of the Attorney General to detain Bartholomeu is "without reasonable foundation" or constitutes in any way an abuse of discretion. *Carlson v. Landon*, 342 U.S. 524, 540–41, 72 S.Ct. 525, 534, 96 L.Ed. 547 (1952). Accordingly, Bartholomeu's within petition for writ of habeas corpus must be and hereby is denied.

**9.** No actions of the INS justify that failing by Bartholomeu. There was no reason for the INS to advise Bartholomeu in 1975 that he was eligible to apply for relief from deportation under section 212(c), 8 U.S.C. § 1182(c), since Bartholomeu was *not* a returning domiciliary. That is so because it was not until 1976, after the Second Circuit decision in *Francis v. Immigration and Naturalization Service*, 532 F.2d 268 (2d Cir. 1976), that the INS adopted the

view that aliens who had not departed from the United States were also eligible to apply for such discretionary relief. *See Matter of Silva*, Interim Decision 2532 (September 10, 1976) and note 2, *supra*. Further, in any event, if Bartholomeu disagreed with the deportation order of INS, he should have promptly sought judicial review of that decision in the courts. Instead, he disappeared and remained a fugitive until arrested in July, 1979.