Michael O'ROURKE, Petitioner,

v.

WARDEN, METROPOLITAN CORRECTION CENTER, Respondent.

No. 81 Civ. 4369 (MEL).

United States District Court,
S. D. New York.

May 24, 1982.

Charles A. Glackin, New York City, for petitioner; Willard H. Myers, III, Wasserman, Orlow, Ginsberg & Rubin, Philadelphia, Pa., of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for respondent; Jane E.

**1132**

Bloom, Asst. U. S. Atty., New York City, of counsel.

LASKER, District Judge.

Michael O'Rourke petitions for a writ of habeas corpus on the ground that he is being unlawfully held without bail pending resolution of his deportation proceedings.

I.

O'Rourke was arrested by agents of the Immigration and Naturalization Service ("INS") early in November, 1979, on charges of being a deportable alien because of illegal entry under 8 U.S.C. § 1251(a)(2). The District Director of the INS, pursuant to 8 U.S.C. § 1252(a), decided that O'Rourke should be held in custody pending final determination of deportability. O'Rourke then applied to Immigration Judge Nathan W. Gordon for bail and his application was denied on November 7, 1979, on the representations of the INS that O'Rourke is a member of the Irish Republican Army ("I.R.A."), that he is a terrorist, and that he had escaped from an Irish prison. (Administrative Record at 3). O'Rourke then appealed to the Board of Immigration Appeals ("BIA"), which remanded the case because there had been no substantiation of the INS assertions about O'Rourke. At the hearing on remand, the INS presented evidence to show that O'Rourke had been convicted in Ireland of possessing explosives and had been sentenced to terms of imprisonment of two years and six years, to run concurrently; that while serving that sentence, O'Rourke and two fellow I. R. A. members escaped from prison by exploding a bomb in a court holding pen in which they were waiting to testify at a trial; and that he faces a possible sentence of life imprisonment from charges arising out of the escape. Asserting his rights under the Fifth Amendment, O'Rourke refused to answer any questions at the hearing. O'Rourke's application for bail was again denied on the basis that he presented a risk of flight. On appeal, the BIA affirmed the decision denying O'Rourke bail.

Soon afterward, on July 17, 1980, it was determined in the separate deportation proceedings that O'Rourke was deportable on the INS' amended charge that he had overstayed his visa. O'Rourke then filed for an "adjustment of status" under 8 U.S.C. § 1255 on the basis of his common-law marriage to an American citizen. In support of his application, O'Rourke argued that he had committed no crimes in the United States and that his I. R. A. activities did not render him excludable because those activities constituted political, rather than common, crimes.

Subsequently, in July, 1980, O'Rourke moved the BIA for reconsideration of its earlier denial of bail. On this occasion, he waived his Fifth Amendment privilege and submitted his own extensive affidavit in which he described how he came to be involved with the I. R. A., his strong conviction that the British presence in Ireland was wrong and oppressive, and the activities leading up to his convictions in Ireland.

According to O'Rourke, he joined the I. R. A. in the summer of 1971, the culmination of a gradually increasing dedication to the cause of the I. R. A. He describes the experience of I. R. A. membership as being "no different than any other Army training." (Administrative Record at 270). He was trained in weapons and explosives use, drilling, and other aspects of soldiering. At the conclusion of his training, he became a regular I. R. A. member and was assigned as an Engineering Officer to work at Army Headquarters, where he was involved in the research, development and manufacture of weapons, explosives, rockets, and mortars for use by I. R. A. troops until his arrest in August, 1975. O'Rourke states that he learned immediately after his arrest that his father had also been arrested and that he was questioned and asked to give a statement, which he refused until the authorities told him that since explosives were found at his home, on his father's property, his father would be charged and sentenced. He claims that he was also told that because of his age, his father would die in prison and that he was told that if he

signed a confession, his father would be freed, and if he did not his father would be charged. He states that his requests for the assistance of counsel were denied and that he eventually signed a confession, and his father was released.

Upon sentence, O'Rourke was imprisoned in the Port Laoise Jail which he describes as a special place of detention for those convicted of I. R. A. activities. As O'Rourke describes the division of authority in the jail, the I. R. A. prisoners were specially treated as political prisoners or prisoners of war rather than as criminals. They were not required to work, were permitted to wear their own clothes, enjoyed free association within the prison and elected their own officers to whom the governmental authorities directed communications; they were allowed unlimited mail and visits, food parcels, radios and other goods from the outside, and simply upon the word of another I. R. A. prisoner assuring return, received unescorted parole to visit death beds or funerals of immediate relatives. The prisoners' daily regime consisted of military drills, Gaelic language courses, guerilla warfare classes, and political discussion sessions, all organized and supervised according to the I. R. A. hierarchy. The prison staff, according to O'Rourke, did not discipline any I. R. A. member: discipline was carried out within the I. R. A. organization itself, and the only function of the prison staff was to prevent escape.

In June of 1976, O'Rourke asserts, he was directed by senior I. R. A. officers to participate in an escape, to be made from a courthouse holding cell. In preparation for the escape, O'Rourke made a small diversionary bomb to distract attention from the larger bombing of the cell's wall through which the escape would occur. He states that he threw the small bomb out of the cell and it landed near a guard who did not see it, and that he yelled to the guard to move away from the bomb, who moved in time to escape injury. Subsequently, the guards fled and O'Rourke and his comrades escaped after opening the cell door with another bomb. According to O'Rourke, he returned to service with the I. R. A. after

his escape, until he learned from I. R. A. intelligence sources that the government was planning to kill him because they believed that he was involved in the death of a British ambassador.

At that point, O'Rourke states, he was instructed to obtain a passport and visa under a ficticious name and to go to the United States. He did so. Once in the United States, he settled in Philadelphia where he made contacts in the Irish community and secured employment doing contracting work. Soon thereafter, he met Margaret Lieb and they fell in love. They wished to get married, but O'Rourke did not want to marry under a ficticious name, so they performed a ceremony themselves in the hope and belief that their action constituted a legal marriage under Pennsylvania common law.

In October, 1979, O'Rourke asserts, he began to hear from friends that the FBI was looking for him and had learned his assumed name and true identity. He decided not to run, but to wait and he was arrested on October 30, 1979.

O'Rourke explained his silence in the earlier bail proceedings on the ground that, at the time of his arrest, the agents told his attorney that they believed that he could provide information about a suspected plot to assassinate British Prime Minister Thatcher and Irish Prime Minister Lynch when they visited the United States as well as on the fact that the Assistant United States Attorney had stated that O'Rourke was believed to have been involved in the murder of the late Lord Mountbatten. Because he had believed that he was the subject of criminal investigations, he refused to answer questions at earlier proceedings until his attorneys determined that the United States government would not prosecute him for any reason, including his alleged illegal entry. In addition, O'Rourke states that since his entry into the United States, he has not been involved in I. R. A. activities, and is deemed to have resigned from the I. R. A., and that his devotion to his wife would assure his not leaving the jurisdiction

before the deportation proceedings are concluded. He states that he wishes to pursue all legal opportunities to gain permanent residence in the United States and asserts that he could have designated countries other than Northern Ireland to which to be deported but has not done so because he wishes to remain in the United States.

In addition to O'Rourke's own affidavit, he presented to the BIA the affidavits of some fifty persons who know him in Philadelphia and who attested to his good character and their belief that he would not flee.

In August, 1980, the BIA denied O'Rourke's motion for reconsideration on the grounds of his admitted participation in I. R. A. activities and the pending charges against him, which the BIA found to create a substantial risk that O'Rourke would flee rather than await the outcome of deportation proceedings which could result in his deportation to Ireland to face possible life imprisonment. The BIA essentially disregarded the "character" affidavits which he submitted, because the affiants were shown to know him only under an assumed name and therefore, according to the BIA, their opinions of him were not entitled to great weight. Moreover, the BIA found the argument as to the importance of O'Rourke's marriage to be unpersuasive because its validity had not been determined. They gave his assertion that he would be able to designate other countries for deportation no weight because it had not been established that he would in fact be able to designate other countries which would be willing to receive him.

Two of the five members of the BIA dissented. They emphasized that O'Rourke had demonstrated close community ties in Philadelphia and close family ties because of his marriage. The dissenters criticized the majority's failure to credit the many affidavits which had been submitted, pointing out that the affidavits had been submitted after the affiants had learned O'Rourke's true identity. The dissenters also expressed concern that O'Rourke had already, by that time, been detained for nine months and that further proceedings were likely to consume many more months as O'Rourke pursued avenues of relief from deportation. The dissenters concluded that O'Rourke should be released on a $50,000. bond.

In May, 1981, O'Rourke again moved for reconsideration of the BIA's decision, this time on the basis that his marriage had been determined to be valid and that his application for a visa had been approved. He also stressed the length of time he had been detained to date and the fact that the proceedings were likely to extend many months into the future since either side would appeal a decision on the pending adjustment of status proceeding.

Before the BIA ruled on that application, Administrative Judge Hupp, who had been presiding over the adjustment of status proceeding, recused himself, stating that he believed that he had been harassed by the INS in connection with the O'Rourke case. O'Rourke then submitted supplemental papers to the BIA, contending that the INS had been acting in bad faith and was guilty of misconduct in ordering an investigation of Judge Hupp to influence his decision in the O'Rourke case. According to O'Rourke, Judge Hupp had indicated during the course of the proceedings before him that he was sympathetic to O'Rourke's application, in particular by ruling that O'Rourke's activities in Ireland were irrelevant to the issue of adjustment of status. O'Rourke also contended that Judge Hupp's recusal would cause substantial further delay since a new administrative judge would need to begin the adjustment of status proceedings from scratch. The INS submitted evidence that the investigation of Judge Hupp was not related to his presiding over the O'Rourke matter and argued that the risk of flight was still great since the adjustment of status for which O'Rourke was applying was a form of discretionary relief which O'Rourke was unlikely to receive because of his criminal background.

The BIA denied O'Rourke's application on the ground that there had been no significant change in circumstances since its last

ruling. It concluded that the fact of O'Rourke's marriage was outweighed by the adverse factors creating a risk of flight, that the INS was not guilty of intentionally delaying the deportation proceedings, and that there was no evidence that the investigation of Judge Hupp was related to his presiding over O'Rourke's case, nor that Judge Hupp had intended to grant O'Rourke the relief requested. One Board member dissented, contending primarily that release was warranted in light of the length of detention.

In July, 1981, O'Rourke filed his habeas petition in this case. Originally he had sought to have the new adjustment of status hearing enjoined on the ground of procedural irregularities relating to Judge Hupp's recusal and the choice of a new administrative judge, in addition to seeking relief from the denial of bail. Since that time, however, he has revised his petition limiting it to the issue of the denial of bail. The delay in determining this matter has been caused in substantial part by O'Rourke's counsel's desire to submit further material, the last item of which was filed in early 1982. The application for adjustment of status has yet to be determined, although we are informed by the parties that all the evidence has been presented.

## II.

■ Section 242(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1252(a), provides:

"Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (1) be continued in custody; or (2) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (3) be

released on conditional parole. But such bond or parole, whether heretofore or hereafter authorized, may be revoked at any time by the Attorney General, in his discretion, and the alien may be returned to custody under the warrant which initiated the proceedings against him and detained until final determination of his deportability. Any court of competent jurisdiction shall have authority to review or revise any determination of the Attorney General concerning detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with such reasonable dispatch as may be warranted by the particular facts and circumstances in the case of any alien to determine deportability."

The Attorney General has delegated virtually all his powers under § 242(a) to the Board of Immigration Appeals. See 8 C.F.R. § 3.1(d). See also United States ex rel. Barbour v. District Attorney, 491 F.2d 573, 577 n.4 (5th Cir.), cert. denied, 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). The BIA, in turn, has construed § 242(a) to provide that the determination to release an alien pending deportation proceedings is "not a discretionary form of relief" but rather "an alien should be detained or required to post a bond, only if he is a threat to national security or is a poor bail risk," Matter of O'Rourke, A22 607 396, Decision and Order of the BIA, August 13, 1980, at p. 3, citing Matter of Patel, 15 I & N Dec. 666 (BIA 1976). The court's scope of review on habeas corpus is limited to the determination whether the agency's decision is supported by, or has reasonable foundation in, the record. United States ex rel. Belfrage v. Shaughnessy, 212 F.2d 128, 129 (2d Cir. 1954); United States ex rel. Barbour v. District Director, supra at 578. See also Stevic v. Sava, 678 F.2d 401, 404 (2d Cir. 1982).

The sole ground presently asserted by the BIA for denying O'Rourke bail is that O'Rourke is a poor bail risk. In assessing

the risk of flight posed by an alien held for deportation proceedings, the BIA has held that its inquiry is essentially the same as that required under the Bail Reform Act, 18 U.S.C. § 3146, *Matter of San Martin*, 15 I & N Dec. 167, 168 n. 1 (BIA 1974), and has enumerated factors to be considered in the decision, including 1) family ties in the United States, 2) employment history, 3) community roots and ties in the United States, 4) length of time in the United States, 5) availability of relief from deportation, 6) length of time for completion of deportation proceedings, 7) criminal record within or without the United States, 8) prior history of immigration violations and 9) manner of entry into the United States and 10) record of appearance at court proceedings.

O'Rourke contends that the BIA did not properly weigh the factors in his case. He notes that the BIA accorded virtually no weight to the close family ties reflected by his marriage and argues that the BIA disingenuously dismissed his numerous affidavits establishing his community ties on the ground that the persons knew O'Rourke under his assumed name. O'Rourke contends that such a reasoning is fallacious because, at the time the affidavits were executed, the affiants did know his actual identity and stated so within the affidavits. Furthermore, O'Rourke argues that the BIA failed to consider his employment history, his length of stay in the United States, or his possible applications for relief from deportation, such as through adjustment of status or asylum. Moreover, O'Rourke contends that although the BIA's decision of August 13, 1980, mentioned concern over the length of time that he had already been incarcerated, and the dissenters at that time suggested release in light of the likely time of incarceration, the latest decision of the BIA fails even to mention this factor. O'Rourke notes additionally that he has no history of violation of immigration laws and that his manner of entry has not been mentioned as a basis for denying bail in any of the BIA decisions.

O'Rourke concludes that, since the above factors generally favor granting bail, the sole basis for the decision to deny bail was his criminal record and the pending charges in Ireland. While conceding that a pending criminal proceeding or a record of criminal convictions are valid factors to be considered in a bail determination to secure a person's presence at a deportation proceeding, O'Rourke strenuously argues that his crimes in Ireland may not be considered in bail proceedings because they were "political" rather than common crimes as those categories are distinguished in various treaties between the United States and other countries. *See generally* 18 U.S.C. § 3181; 6 Whiteman, *Digest of International Law*, 799–857 (1968); Cantrell, *The Political Offense Exemption in International Extradition: A Comparison of the United States, Great Britain and the Republic of Ireland*, 60 Marquette L.Rev. 77 (1977). Specifically, O'Rourke relies on the provision of the Refugee Act of 1980, 8 U.S.C. § 1253(h) which bars deportation to a country "if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion ..." According to O'Rourke, the differentiation in that act between "a serious non-political crime" and other crimes is intended to incorporate the traditional distinction between political and nonpolitical crimes reflected in extradition treaties. O'Rourke contends that he should not be denied bail on the basis of crimes which are political in nature since he could not ultimately be deported to answer for those crimes.

The government responds that O'Rourke was properly found to be a poor bail risk in light of the fact that he faces a possible sentence of life imprisonment for his escape if he is returned to Ireland and that he also would be required to complete the sentence he was serving when he escaped. In addition, the government contends that O'Rourke's record of employment was unstable, his family ties in the United States consisted solely of his marriage, and the members of the Philadelphia community attesting to his good character knew him un-

der an assumed name. Accordingly, the government argues that the BIA properly gave these factors little weight. Finally, the government maintains that the issue whether O'Rourke's crimes were political crimes is pending in the adjustment of status proceeding and should not be determined in this forum.

### III.

This case reflects the dilemma posed by the combination of three circumstances. First, human conduct cannot be predicted with reasonable certainty. Second, existing procedures for determining the legality of deportation decisions and for determining the availability of relief from those decisions are complex and lengthy. Third, there is no available mechanism for ensuring the availability of persons who may be determined to be subject to deportation and are found to be poor bail risks other than to keep them incarcerated.

Michael O'Rourke presently suffers the consequences of this dilemma. Although he has not been charged with, much less convicted of, any crime in the United States, he has spent some two and one-half years in the type of incarceration ordinarily utilized for those awaiting trial on criminal charges. Unlike a pre-trial detainee, however, there is no requirement for one in O'Rourke's circumstances that the civil charges against him be speedily determined. Indeed, it has been held by the BIA, and we have no reason to question the decision, that the government has been guilty of no intentional delay of the O'Rourke proceedings. Furthermore, since it is reasonably clear from the record that both the government and O'Rourke intend to appeal any unfavorable decision, the proceedings may last for an additional substantial period of time. Thus, O'Rourke may eventually spend over three years in detention before his deportability to Ireland is finally determined and all procedures for relief are exhausted.

This lengthy incarceration must cause concern in any community accepting the basic concept that a person ought not be required to suffer essentially criminal penalties when he or she has not been determined to be, or charged with being, criminally liable by the detaining authorities. In this regard, O'Rourke's detention is all the more troublesome because he is being held for deportation, not extradition.

■ Nevertheless, there is no question that the government has the constitutional authority to detain O'Rourke if there is reasonable cause to believe that he may flee rather than face deportation. Moreover, our scope of review of the BIA's decision is limited to the single issue whether the BIA's determination has a reasonable foundation in the record. We conclude that it does.

■ The overriding factor supporting the BIA's determination that O'Rourke poses a substantial risk of flight is O'Rourke's admitted escape from prison in Ireland and the possible life sentence to which he is subject should he be returned to Ireland. His prior escape demonstrates that he is willing to utilize illegal, even violent, means to avoid serving his sentence in an Irish prison. Since one of the possible consequences of a determination that he is deportable to Ireland would be a resumption of his Irish prison sentence, and indeed the imposition of a longer sentence, it was not unreasonable for the BIA to conclude that O'Rourke may similarly avoid a return to Ireland by avoiding the American legal process.

This does not mean he would do so. We have been impressed by the sincerity of his own affidavit, and that of his wife, and we recognize that the offenses he has committed were in the service of a cause in which he and many others devoutly believe, and that this may distinguish his past history from what his behavior would be in the United States. Under present circumstances, however, on this application, the question is not what our opinion might have been as a member of the BIA, but instead to determine whether there was a reasonable foundation in the record for the decision actually reached by the BIA.

O'Rourke's argument that his offenses in Northern Ireland may not be utilized to determine if he is a poor bail risk because they were political crimes misconceives the relevance of his convictions and pending charges to the determination of bail. O'Rourke's argument assumes that the Irish criminal record was used to determine his moral character or his trustworthiness. If such were the case, it would surely be relevant that O'Rourke's crimes were not the crimes of a petty criminal, but rather the crimes of one believing that he was fighting in a war of national liberation. However, the relevance of O'Rourke's criminal record is to the possible adverse consequences to which he would be subject if he is unsuccessful in the pending deportation proceedings. Given the impossibility of determining the intentions of one in O'Rourke's position, one must rely on inferences from human nature, the known facts about O'Rourke, his past conduct, and his possible motivations for avoiding deportation. The sentence to which he would be subject in Ireland is certainly an objective basis upon which to infer a risk of flight from deportation proceedings.

This is not to say, however, that the possible political nature of O'Rourke's crimes is totally irrelevant to the determination of bail. While, as noted above, the possible adverse consequences attaching to a decision to deport O'Rourke to Ireland are relevant to the risk of flight, the possibility that he may not be deported to Ireland is also relevant, just as in the analogous setting the strength or weakness of the prosecution's case is considered in determining bail for a pre-trial detainee. To the extent that O'Rourke's arguments that his crimes were political may tend to support his position that he may not be deported, and at the least may not be deported to Ireland, they weaken the foundation for assuming that O'Rourke faces likelihood of deportation to Ireland and consequently that he faces a possible life sentence at the conclusion of the deportation proceedings. It is worth noting in this regard that the recent decisions in *In re Mackin*, 80 Cr. Ms. 1, P. 54 (S.D.N.Y. August 13, 1981), that an I. R. A. member had committed only political offenses and therefore was not subject to extradition, and in *Stevic v. Sava, supra,* determining that the Refugee Act of 1980 relaxed the standard for determining when an alien is a political refugee, at least indirectly add weight to O'Rourke's position. In light of these developments, O'Rourke may wish to move for reconsideration of the BIA's decision denying him bail. The point is that the primary relevance of O'Rourke's arguments as to the political nature of his crimes is to his entitlement not to be deported. The arguments are relevant to the bail determination only to the extent that they demonstrate the strength of O'Rourke's defenses against deportation.

In sum, while we tend to agree with O'Rourke that his evidence of ties in the community and of his marriage and conduct in the United States may have been given less weight than it deserved, and while we may have given other favorable evidence greater weight were the decision ours to make, we do not agree that, in light of that evidence, there was an insufficient basis to deny O'Rourke's release. The BIA was entitled to place greater emphasis on the adverse consequences which O'Rourke might suffer if it is determined that he is deportable to Northern Ireland and to O'Rourke's past conduct in avoiding imprisonment than to the evidence of family and community ties in the United States. It is clear from the record that the BIA found these unfavorable factors to be of overriding significance, and in these circumstances such a determination cannot be said to lack reasonable foundation.

O'Rourke's petition for a writ of habeas corpus is denied. Certificate of probable cause pursuant to F.R.A.P. 22(b) is granted.

It is so ordered.