# In re R-S-H- et al., Respondents

*Decided as amended August 4, 2003[1]*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Under 8 C.F.R. § 1003.46(i) (formerly 8 C.F.R. § 3.46(i)), the mandatory consequence for violating a protective order is that the respondent becomes ineligible for any form of discretionary relief, except for bond.

(2) The mandatory consequence for breaching a protective order will be applied unless a respondent fully cooperates with the Government in any investigation relating to the noncompliance and, additionally, establishes by clear and convincing evidence either that extraordinary and extremely unusual circumstances exist or that failure to comply with the protective order was beyond the control of the respondent and his or her attorney or accredited representative.

(3) The presence of federal employees, including court personnel or Department of Justice attorneys, at a closed hearing where a protective order is discussed does not violate the protective order regulations.

(4) The respondent is ineligible for any form of discretionary relief, except for bond, because a protective order issued by the Immigration Judge was violated by disclosure of protected information to unauthorized persons.

FOR RESPONDENTS: Ashraf W. Nubani, Esquire, Springfield, Virginia

FOR THE DEPARTMENT OF HOMELAND SECURITY:[2] Marsha Kay Nettles, District Counsel

BEFORE:   Board Panel: HOLMES, Acting Vice Chairman; HURWITZ and OSUNA, Board Members.

HOLMES, Acting Vice Chairman:

In a decision dated November 22, 2002, an Immigration Judge found the respondents removable and ineligible for asylum, withholding of removal, and voluntary departure, and ordered them removed from the United States. The

---

[1] On our own motion, we amend the May 19, 2003, order in this case. The amended order makes editorial changes consistent with our designation of the case as a precedent.

[2] The functions of the Immigration and Naturalization Service have been transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. The transfer occurred on March 1, 2003. *See Matter of D-J-*, 23 I&N Dec. 572, 573 n.1 (A.G. 2003).

respondents have appealed from that decision.  The Department of Homeland Security ("DHS"), formerly the Immigration and Naturalization Service, has filed a brief in opposition to the appeal.  The appeal will be dismissed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The respondents are a married couple and three of their children.[3]  The adult male, who is the lead respondent, is a native and citizen of Lebanon, as is one of the minor respondents.  The adult female respondent and one of the children are natives and citizens of Kuwait.  The third minor respondent is a native of Kuwait and a citizen of Lebanon.  The family was admitted to the United States on September 2, 1998, as nonimmigrant visitors with authorization to remain until August 31, 1999.

The lead respondent was served with a Notice to Appear (Form I-862) on December 14, 2001.  The other respondents were served on January 18, 2002.  The respondents' proceedings were consolidated before the Immigration Judge, and they conceded removability.  The lead respondent filed an Application for Asylum and Withholding of Removal (Form I-589).[4]  The respondents also requested voluntary departure.

During the course of proceedings, the DHS requested that one of its central documents, the declaration of Special Agent Brent E. Potter of the Federal Bureau of Investigation ("the Potter Declaration"), be subject to a protective order pursuant to 8 C.F.R. § 3.46.[5]  *See* Protective Orders in Immigration Proceedings, 67 Fed. Reg. 36,799, 36,802 (May 28, 2002).  The order was granted by the Immigration Judge on August 27, 2002.  The Immigration Judge issued an amended order on October 1, 2002.[6]  The Immigration Judge subsequently found that respondent's counsel violated the protective order by giving the Potter Declaration to unauthorized persons and ordered him to provide more information on the violation.[7]

---

[3]  The adult respondents also have a United States citizen child who was born in 1993.

[4]  The other family members are listed as dependents.  Hereinafter, any mention of the respondent in the singular refers to the lead respondent.

[5]  As a result of the transfer of the functions of the Immigration and Naturalization Service to the Department of Homeland Security, the regulations in chapter I of the Code of Federal Regulations were transferred or duplicated to a new chapter V, and this regulation is now codified at 8 C.F.R. § 1003.46.  *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9831 (Feb. 28, 2003), 2003 WL 553495.  References in this decision to the current version of the regulations will therefore be cited according to their new designation.

[6]  Public and protected versions of the Potter Declaration are included in the record.

[7]  The Immigration Judge's November 22, 2002, decision sets out the procedural history of this case, including the lead respondent's custody proceedings and related federal litigation.  We adopt that portion of his decision and incorporate it into the instant decision.  We note that

(continued...)

## II.  TESTIMONY AND OTHER EVIDENCE

The respondent initially testified that he had an alternative name to add to his asylum application.  The name was acquired after his conversion to Islam, and he did not initially list it because it was not an alias but was based on the projected name of his first son.  The respondent did eventually have a child of this name who passed away.  The respondent was born a Christian and started practicing Islam in 1979.  He began to intensely study and practice his religion in 1986, and it "fully transformed" his life.  The respondent eventually learned enough to be referred to as an "Imam."

The respondent recalled working in an ambulance and fire rescue unit in Lebanon during the civil war in the 1970s.  He denied ever receiving military or paramilitary training, or ever being involved in terrorist activities.  The respondent was a cofounder, treasurer, and board member of the Global Relief Foundation ("GRF").  The respondent stated that it was strictly an Islamic humanitarian organization.  The GRF office was located in Bridgeport, Illinois.

The respondent explained the five pillars of Islam.  For example, he stated that the term "jihad" covered internal, personal struggles but could have a military connotation.  The concept of "zakat" is a percentage of income to be distributed to the poor.  Under Islam, a visitor to a foreign country would be obliged to abide by the rules of that country upon recognition that a "contract" regarding the admission exists.  The respondent condemned the horrific acts of September 11, 2001, and did not find them to be in any way justified under Islam.  The respondent also disagreed with the concept of "fatwah" as issued by Osama bin Laden against Americans.

The respondent explained that the GRF often operated with foreign nongovernmental organizations and accepted money from a variety of donors.  He denied that the GRF supported terrorism or had ever provided material support to Al Qaeda or the Taliban.  The GRF did support charitable operations in Afghanistan before and after September 11, 2001, and the organization consulted with the United States Embassy in that country before undertaking activities after that date.  The GRF also engaged in relief activities in other countries with Moslem populations, such as Pakistan.

The GRF had a "sister" organization in Belgium, and the respondent was listed on its articles of incorporation.  The respondent was aware of the Belgian office's activities although he had not actually visited it.  The respondent denied personally knowing Wadih el Hage, who had been

---

[7] (...continued)

bond and removal are distinctly separate proceedings.  *See* 8 C.F.R. § 1003.19(d) (formerly 8 C.F.R. § 3.19(d)).  Accordingly, although the respondent has raised custody-related issues on appeal, we do not address them further in this decision.

convicted of the United States Embassy bombings in Kenya and Tanzania. He explained that it would not be unusual for the Belgian branch to receive money from various organizations, such as the Holy Land Foundation, which has been named a Specially Designated Global Terrorist ("SDGT") organization by the United States Department of State. The respondent denied knowledge of any of the photographs that were found in a dumpster behind the GRF office in 1997 and were listed as suspicious in the Potter Declaration.

The respondent frequently wrote and edited articles for the GRF newsletter and spoke in public and at mosques. He did not urge support for armed struggle and was unaware of any GRF funds being used for this purpose. He would cancel a GRF project if he became aware of the misuse of funds. The respondent participated in several community activities after September 11, 2001, including those that involved other local religious leaders.

The respondent feared returning to Lebanon for several reasons. One stemmed from the publicity generated in the United States as a result of allegations that he had terrorist ties, including ties to Osama bin Laden and the Al Qaeda terrorist organization. The respondent believed that he would be targeted by the Lebanese Government, which was strongly influenced by Syria. He asserted that both countries had an interest in appeasing the United States. The respondent also feared retaliation from Al Qaeda operatives in Lebanon, or related entities, because of his condemnation of the events of September 11, 2001. Additionally, he feared persecution from Christian groups as a result of his conversion. He did not believe that the Lebanese Government would or could protect him.

The DHS conducted a lengthy cross-examination. The respondent reasserted that he was unaware of any militaristic or terrorist activities supported by the GRF. He had access to donor information, and his contact with the Belgian office was "very scarce." He was aware that a $200,000 donation had been made to that office, but he did not know that it was from Wadih al Hage. The respondent was shown a newsletter, which was allegedly issued by the GRF, calling for zakat to provide food and ammunition for armed struggle. The respondent acknowledged that the document looked like it was issued by the GRF, but he did not recall the particular publication.

It was revealed during cross-examination that the respondent had lived in Lebanon from June 1997 to September 1998. He stated that he had no problems during that period related to his religion. His mother still lives there and runs a store. The respondent's father recently passed away.

The respondent reviewed his travel history. He married his spouse in the United States in 1987 and lived in Pakistan pursuant to a work permit from 1988 to 1992. He subsequently went to Kuwait for approximately 1 year and then returned to the United States. He had a visitor's visa and remained here until 1996 with visits to Lebanon, Kuwait, and Pakistan. The respondent was

in Kuwait from 1996 to 1997, and in Lebanon until 1998. He returned to the United States in September of that year with a nonimmigrant visa and has remained here since that time.

The respondent visited Afghanistan to check on relief activities in 1989 and 1994. The respondent's father-in-law was formerly a high-ranking diplomat in Kuwait. The respondent explained that Kuwait has very strict residency laws, and that he would not necessarily receive residency there just because he was married to a Kuwaiti citizen.

The respondent's brother testified on his behalf.[8] He stated that he was a dual citizen of Canada and Lebanon. He was Christian but supported his brother's conversion to Islam. The witness frequently returned to Lebanon and was last there in the summer of 2002. At that time, the respondent's situation was being publicly discussed, and the witness saw articles in the Lebanese media that labeled the respondent a terrorist. The witness did not bring these articles with him because they were not in English.

During his last visit to Lebanon, the witness contacted the Minister of Economy to seek assistance in resolving the respondent's detention in the United States, but the politician did not want to talk about the respondent. His mother sought similar assistance from the Deputy Prime Minister, who also did not want to get involved in the matter, because the respondent had been associated with terrorism. The witness recalled that a family member disappeared in the 1980s. He testified that the current Lebanese Government treats political dissidents very harshly, and he thought that the respondent would be compromising his safety if he returned to Lebanon. However, he declined to offer any specific picture of what might actually happen.

On cross-examination, the witness agreed that no one in the Lebanese Government had contacted his family about the respondent's "case." He was then asked why his written statement declared that his family members had been questioned about cell phone calls made to, or received from, the respondent in the United States. The witness explained that the written statement referred to inquiries made by the Government before September 11, 2001. However, no one had approached the family after that date.

The DHS argued that the respondent is not eligible for asylum for several reasons, including the bar that applies to an alien who is a danger to national security. The DHS submitted the Potter Declaration and other documentation as proof on this issue. Regarding the contents of the Potter Declaration that are subject to the protective order, we adopt the Immigration Judge's discussion of this document as set out in the appendix to his final decision.

The record also contains evidence that on December 14, 2001, the Department of the Treasury, Office of Foreign Assets Control ("OFAC"),

---

[8] On appeal, the respondent states that his wife, two brothers, and friends presented testimony on his behalf. However, only the one brother testified at the removal hearing.

issued an order blocking the assets of the GRF.  Further, on October 18, 2002, the OFAC named the GRF as an SDGT organization.[9]  This designation was made pursuant to an Executive Order that is titled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism."  Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001), 2001 WL 1126562.  The DHS also provided other documents to support its position, including Department of State information on Lebanon and Kuwait.  The State Department's 2001 Country Report on Lebanon states that there were no reports of politically motivated disappearances that year.  Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *Lebanon Country Reports on Human Rights Practices - 2001* (Mar. 2002), *available at* http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8270pf.htm.

The respondent's evidence includes affidavits from his brothers and other persons who verify his identity.  He provided articles on Lebanon and Syria, and information from Human Rights Watch and Amnesty International.  The respondent also submitted newspaper articles discussing his situation and the investigation of the GRF.  *E.g.*, *A Nation Challenged; Marshals Transfer Detainee to Chicago*, N.Y. Times, Jan. 15, 2002, at A12.

During the final hearing on October 23, 2002, proceedings were briefly closed and held off the record at the respondent's request to discuss the protected evidence.  The Immigration Judge subsequently explained that closing the hearing was unnecessary, as the respondent was only seeking more time to comply with directives related to his violation of the protective order.  The record was left open for additional evidence on this issue.

## III.  DECISION OF THE IMMIGRATION JUDGE

In his written decision on November 22, 2002, the Immigration Judge first found that the respondent did not file his application for asylum within 1 year of his admission, as required, but he determined that this late filing was excused under the "changed circumstances" exception.  *See* section 208(a)(2)(D) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a)(2)(D) (2000); 8 C.F.R. § 1208.4(a)(4) (formerly 8 C.F.R. § 208.4(a)(4)).  These changes related to the investigation of the GRF and the respondent.  The Immigration Judge next rejected the DHS's argument that the respondent was barred from asylum because he had "firmly resettled" in either Pakistan or Kuwait.  *See* section 208(b)(2)(A)(vi) of the Act.  Specifically, the Immigration Judge determined that there was no resettlement because the respondent had not been fleeing persecution when he was in those countries.  Alternatively, he concluded that the bar did not apply because the

---

[9] The GRF's responses to this designation are also in the record.

respondent had not been offered residency or any form of permanent resettlement in either country.

The Immigration Judge found that the respondent was barred from asylum and withholding of removal because he was a danger to the security of the United States. He referred to the protected information in the Potter Declaration, which he concluded was reliable and indicated that the respondent was a security risk. The Immigration Judge emphasized that the respondent did not rebut the specific accusations in the document.

The Immigration Judge also noted that a "plethora" of public information linked the respondent to terrorist activities. First, he referred to the respondent's "direct and nascent" ties to the GRF, which had been classified as an SDGT organization. Second, the public portions of the Potter Declaration linked the GRF and its Belgian counterpart to Wadih el Hage, who was convicted of the United States Embassy bombings in Kenya and Tanzania and had ties to Osama bin Laden. Third, the GRF's own literature undermined the respondent's claim that it was strictly a humanitarian organization. For example, the record contained the GRF zakat worksheet, which mentioned disbursement of funds to equip "raiders" with ammunition and food. Finally, the public portions of the Potter Declaration listed suspicious photographs, including those of sophisticated communication equipment, found in a dumpster behind the GRF office in 1997. This equipment was similar to that used in terrorist operations. Another photograph was of two deceased men with the caption "Hizbul Mujahideen." This group was referred to as a known terrorist organization.

The Immigration Judge found that the respondent's testimony that he was unaware of any GRF terrorist-linked activities was not credible. In this regard, the Immigration Judge considered the respondent's high-level positions and long affiliation with the organization, as well as his acknowledgment that projects originating in Belgium were approved at the Bridgeport office.

The Immigration Judge alternatively held that the protective order breach by the respondent's counsel precluded the respondent from discretionary relief under 8 C.F.R. § 3.46(i). He explained that sometime between the initial protective order and its amendment, the respondent's counsel had given a complete copy of the Potter Declaration to two individuals without requesting permission from the Immigration Judge. He ruled that although the respondent and his counsel arguably cooperated with the court's investigation of the matter, the respondent did not meet the burden imposed by the regulation of establishing that either extraordinary and extremely unusual circumstances existed or that the breach was due to circumstances beyond the control of the respondent or his counsel.

Setting aside the issues of statutory ineligibility, the Immigration Judge found that the respondent did not otherwise meet his burden of proof for

asylum and withholding of removal. The Immigration Judge initially determined that the respondent's brother was not credible, and he emphasized the discrepancies between the witness's oral and written testimony. He also deemed the witness's testimony to be "patently evasive" and was bothered that the witness did not produce the articles about the respondent that he claimed he saw in Lebanon. The Immigration Judge alternatively concluded that if the testimony of record was accepted as true, the respondent still did not meet his burden of proof for asylum or withholding of removal.

In this regard, the Immigration Judge found no evidence that the respondent would be persecuted as a converted Moslem, or that any Al Qaeda operatives would target him in Lebanon. He noted that the respondent failed to provide evidence to show that he had publicly denounced the events of September 11, 2001, and that if he did, he was only expressing "the majority view of the civilized world." The Immigration Judge also concluded that the respondent did not establish that the Lebanese Government would persecute him based on any events in the United States, including an investigation of him by the United States Government. Additionally, he noted that the respondent indicated during closing that he would not be pursuing relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture").

The Immigration Judge held that the lead respondent was ineligible for voluntary departure because of the breach of the protective order. Additionally, he determined that the female and minor respondents did not submit any evidence to show good moral character. According to the Immigration Judge, the lead respondent was not a convincing witness on his claims of good moral character because he had misrepresented the length of his residence in the United States on a firearm application filed in Michigan and was not credible when he denied knowledge of GRF activities. Finally, the Immigration Judge found the respondents ineligible for voluntary departure because they did not establish the means and intent to depart the United States and none of them had current passports. The Immigration Judge therefore ordered that the respondents be removed from the United States.

## IV. ARGUMENTS ON APPEAL

The respondent argues that the evidence of record does not support the Immigration Judge's finding that he is a danger to national security. Rather, he claims that the Immigration Judge's decision was unduly influenced by the Government's accusations that the respondent had terrorist links and by the presence of Department of Justice ("DOJ") attorneys at the hearing. He

asserts that the attorneys' presence at the closed portion of the hearing violated the protective order. The respondent also claims that the Potter Declaration was prejudicial to his case, and that even if the statements within it were accepted as true, it would not prove him a terrorist.

The respondent challenges the finding that he should be denied discretionary relief because of his counsel's violation of the protective order. He additionally argues that the Immigration Judge's credibility findings should be overturned as "clearly erroneous" and that he should be granted asylum on the merits or on a humanitarian basis. The respondent challenges the Immigration Judge's reliance on country reports by the Department of State. Finally, he claims that all the respondents should have been granted voluntary departure, and that the Immigration Judge failed to give the family proper notice of their voluntary departure options.

The DHS contends that the decision of the Immigration Judge should be affirmed because the record supports his conclusions of law and findings of fact. In this regard, the DHS emphasizes that factual determinations can only be overturned if clearly erroneous. According to the DHS, the respondents received a full and fair hearing and did not raise any timely objections to the presence of the DOJ attorneys at the hearing. The DHS maintains that it was appropriate for these Government employees to attend the hearing, and that their presence in any closed proceeding did not violate the protective order.

## V.  STANDARD OF REVIEW

We review findings of facts by the Immigration Judge, including those pertaining to the credibility of testimony, to determine whether the findings are "clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i) (formerly 8 C.F.R. § 3.1(d)(3)(i)).[10] It has been held that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). "A factfinding may not be overturned simply because the Board would have weighed the evidence differently or decided the facts differently had it been the factfinder." Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54,878, 54,889 (Aug. 26, 2002) (Supplementary Information) (*citing Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)). The Board may review all questions of law, discretion, and judgment and all other issues in appeals from decisions of Immigration Judges "*de novo*." 8 C.F.R. § 1003.1(d)(3)(iii).

---

[10]  This regulation applies to a Notice of Appeal filed on or after September 25, 2002. 8 C.F.R. § 1003.3(f) (formerly 3.3(f)); *see also Matter of S-H-*, 23 I&N Dec. 462 (BIA 2002).

## VI. ANALYSIS

### A. Fair Hearing Issues

On appeal, the respondent argues that he did not receive a fair hearing.[11] He claims that the Immigration Judge was biased and prejudged his case because the Government linked him to terrorism and because DOJ attorneys were present at his hearing. We have reviewed the record in its entirety and find no meaningful support for this claim. *See Matter of Exame*, 18 I&N Dec. 303, 306 (BIA 1982). As is explained below, the Immigration Judge's decision is supported by the evidence of record, including his finding that the respondent was barred from relief as a "danger to national security." There is no indication that the Immigration Judge prejudged the case or that his decision was motivated by issues outside the evidence of record.

Further, we see nothing inherently unfair about the presence of DOJ attorneys at any part of the hearing. The hearing was open to the public by the respondent's choice. Moreover, the record does not reflect that the respondent raised any objections to the attorneys' presence at the hearing. Therefore, the respondent waived his opportunity to pursue this issue on appeal. *See generally Matter of Garcia-Reyes*, 19 I&N Dec. 830, 832 (BIA 1988) (explaining that objections should be made on the record to preserve them for appeal).

### B. Protective Order Issues

As previously mentioned, the DHS submitted evidence that was subject to a protective order under 8 C.F.R. § 1003.46. On appeal, the respondent has not challenged the validity of the protective order. The regulation at issue states the following:

> If the [DHS] establishes that a respondent, or the respondent's attorney or accredited representative, has disclosed information subject to a protective order, the Immigration Judge *shall* deny all forms of discretionary relief, except bond, unless the respondent fully cooperates with the [DHS] or other law enforcement agencies in any investigation relating to the noncompliance with the protective order and disclosure of the information; *and* establishes by clear and convincing evidence either that extraordinary and extremely unusual circumstances exist or that failure to comply with the protective order was beyond the control of the respondent and his or her attorney or accredited representative.

8 C.F.R. § 1003.46(i) (emphasis added).

The respondent asserts that the Immigration Judge had no basis to find that counsel in this case violated the protective order. However, the violation had been conceded during the proceedings.

---

[11] The respondents conceded their removability at the hearing so that is not at issue.

The Immigration Judge found that while the respondent and his attorney arguably cooperated with his investigation of the violation, the respondent did not present evidence to show that either extraordinary and extremely unusual circumstances existed, or that the violation was due to circumstances beyond his or his counsel's control. The respondent does not specifically argue on appeal that either of these exceptions was established at the hearing. Rather, the respondent's argument is that his cooperation with the investigation should have been enough to excuse the violation and that the lack of actual harm from the disclosure should be determinative.

The language of the regulation makes it clear, however, that cooperation with the investigation alone is not enough to excuse a breach. Otherwise, the regulation would not also require that certain circumstances exist before a violation is excused. Further, the exceptions are narrow in scope and do not involve a determination whether the Government was prejudiced by the disclosure. We follow the clear directives of the regulation and will not read it otherwise. *See Matter of Anselmo*, 20 I&N Dec. 25, 30 (BIA 1989) (explaining that a regulation promulgated by the Attorney General has the force and effect of law as to the Board and the Immigration Judges).

The consequence of an unexcused disclosure is that an alien becomes ineligible for any form of discretionary relief, except bond. The use of the word "shall" in the regulation indicates that the bar to relief is mandatory. *See Lopez v. Davis*, 531 U.S. 230, 240-41 (2001) (discussing the use of "shall" versus "may" in a statute). The Immigration Judge therefore correctly found that the respondent was barred from discretionary relief.

In a related issue, the respondent argues that the Immigration Judge violated the protective order by allowing the DOJ attorneys to be present during the closed portion of the hearing when the protective order was discussed. We disagree. A protective order is issued to ensure that sensitive information can be protected from general disclosures, and it is couched in terms of its application to the respondent and his representative of record. *See* 8 C.F.R. § 1003.46; *see also* 67 Fed. Reg. at 36,799-36,801 (Supplementary Information). There is nothing in the regulations to indicate that the order extends to other federal employees, including court personnel or attorneys outside of the DHS. Therefore, we find that the presence of these persons during the closed hearing did not violate the protective order regulations. We note as well that nothing substantive transpired during the closed portion of the hearing at the end of the proceeding, as the parties agreed that no closed hearing was necessary.

## C.  Asylum and Withholding of Removal

### 1.  Reasonable Grounds for Finding That the Respondent Is a "Danger to the Security of the United States"

The Act states that an alien is ineligible for asylum when "there are reasonable grounds for regarding the alien as a danger to the security of the United States."  Section 208(b)(2)(A)(iv) of the Act.  A similar bar exists for withholding of removal.  Section 241(b)(3)(B)(iv) of the Act, 8 U.S.C. § 1231(b)(3)(B)(iv) (2000) (providing that an alien is ineligible when "there are reasonable grounds to believe that the alien is a danger to the security of the United States").  The respondent asserts that the evidence of record does not support the Immigration Judge's application of these bars.  We disagree.

Where the evidence indicates that one or more of the grounds for mandatory denial of an application for relief may apply, the alien has the burden of proving by a preponderance of the evidence that such grounds do not apply.  *See* 8 C.F.R. § 1240.8(d) (formerly 8 C.F.R. § 240.8(d)).  The DHS produced significant evidence to support its position that the respondent is a danger to our national security.  This included the Potter Declaration, a detailed document that was the result of an ongoing federal investigation conducted over several years.  The respondent did not rebut the contents of the document, including the protected portions, which are set out in the appendix to the Immigration Judge's final decision.[12]  We find that this protected information is enough to trigger concerns about the respondent and to establish "reasonable grounds" under the Act.

However, the Immigration Judge's findings are not based on the protected information alone.  Rather, he stated that even without the protected information, there were four other specific reasons to conclude that the respondent had links to militaristic and terrorist activities, mainly through his close ties to the GRF.  We see no error in these factual findings and conclude that they also establish the "reasonable grounds" necessary for triggering the bar.  We accordingly adopt this portion of the Immigration Judge's decision.

We point out that the respondent did not deny that he participated in the events noted by the DHS, including GRF activities.  Instead, he argued that these events were not a fair basis for triggering suspicion.  We disagree and, for the reasons stated by the Immigration Judge, find this evidence sufficient to establish the requisite "reasonable grounds" under sections 208(b)(2)(A)(iv) and 241(b)(3)(B)(iv) of the Act.

Further, the respondent ultimately has the burden to establish his eligibility for relief, and he has failed to directly rebut the public and private portions

---

[12]  The respondent has not challenged the Immigration Judge's summarization of these portions of the Potter Declaration and, as stated earlier, we adopt this description and incorporate it into our decision.

of the Potter Declaration or to establish why the GRF should not be considered to have terrorist links. His arguments on appeal deal in generalities about the "paucity" of evidence but do not explain in any detail how the findings are clearly erroneous. This includes the Immigration Judge's finding that the respondent lacked credibility in claiming that he was unaware of many significant GRF activities, despite his role in the organization.

Regarding the adverse credibility determination, we defer to the Immigration Judge's finding in accordance with the "clearly erroneous" standard of review. *See* 8 C.F.R. § 1003.1(d)(3)(i); *see also United States v. United States Gypsum Co.*, *supra* (holding that a finding of fact is clearly erroneous when there is a firm and definite conviction that a mistake has been made). In light of the detailed findings by the Immigration Judge, the respondent was obligated on appeal to challenge those findings in a specific manner. It is not enough to challenge them only in generalities, as the respondent has done.

As the Immigration Judge correctly concluded, the evidence indicates that there are reasonable grounds for regarding the respondent as a danger to the security of the United States. The respondent has not met his burden of proving, by a preponderance of the evidence, that this mandatory ground for denial of asylum and withholding does not apply.

## 2. Merits of the Respondent's Claim

We agree with the Immigration Judge's alternative finding that the respondent did not meet his burden of proof for asylum or withholding of removal. An applicant for asylum has the burden of proving a well-founded fear of persecution.[13] To make such a showing, the alien must establish that a reasonable person in his or her circumstances would fear persecution on account of a protected ground. *See INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987); 8 C.F.R. § 1208.13(b)(2)(i)(B) (formerly 8 C.F.R. § 208.13(b)(2)(i)(B)). To establish eligibility for withholding of removal, an alien has the burden of showing that it is more likely than not that he or she will be persecuted. *See INS v. Cardoza-Fonseca*, *supra*; *INS v. Stevic*, 467 U.S. 407 (1984); 8 C.F.R. § 1208.16(b)(2) (formerly 8 C.F.R. § 208.16(b)(2)). An applicant for asylum or withholding of removal must establish that the feared persecution is on account of race, nationality, religion, membership in a particular social group, or political opinion. *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Matter of S-A-*, 22 I&N Dec. 1328 (BIA 2000).

The respondent's asylum claim has three components. One aspect of his claim is that he will face persecution on return to Lebanon based on his conversion to Islam. We agree with the Immigration Judge that the respondent

---

[13] The respondent's claim was not based on past persecution.

did not meet his burden of proof in this regard, and we adopt that portion of the Immigration Judge's decision.

The respondent also claims that he faces harm in Lebanon from Al Qaeda members, or their operatives, as a result of his public condemnation of the terrorist acts of September 11, 2001. As mentioned by the Immigration Judge, the respondent did not present evidence that he has widely disseminated this view. Setting this aside, we agree with the Immigration Judge's statement that the respondent's claim in this regard is too speculative to be the basis for a grant of asylum or withholding. Most significantly, the respondent has not produced any evidence that Al Qaeda has an interest in him, that it has operatives in Lebanon, or that these operatives would target him for retribution based on his stated condemnation of the September 11 attacks.

The respondent's remaining reason for fearing persecution relates to the publicity generated in the United States associating him with terrorism. He claims that he will either be targeted by the Lebanese Government directly, or through the influence of Syria. He asserts that both Governments have an interest in appeasing the United States. We agree with the Immigration Judge that even aside from questions about his credibility, the respondent has not met his burden of proof for asylum in this regard.

The Immigration Judge found that the fact that two high-ranking Lebanese politicians did not want to intervene on the respondent's behalf only meant that they did not want to expend political capital for his benefit, not that they had any inclination to persecute him. This is a fair assessment, and the officials' actions do not give any indication that the Government would persecute the respondent upon his return to Lebanon. Further, as noted by the Immigration Judge, it is significant that no officials have made contact with the respondent's family since September 11, 2001. The contact preceding this date, as described by the respondent's brother, provides no reason to conclude that the respondent will face persecution on his return to Lebanon for the reasons outlined in his asylum claim.

The respondent and his brother testified regarding a Canadian citizen who was apparently deported from the United States to Syria on suspicion that he was an Al Qaeda supporter. This incident involved circumstances different from those of the respondent, and it is not clear what happened to the individual in question. The articles cited by the respondent therefore do not provide support for his claim. At the hearing, respondent's counsel stated he had heard that the individual in question was now missing. This is tenuous evidence, which, even if true, does little to further the respondent's own claim.

The respondent has submitted news articles and country reports on Lebanon and Syria. This information establishes that both countries have taken a hard line against terrorists, that there are some human rights concerns

in each country, and that they have close ties with one another. However, this information does not establish that someone in the respondent's situation objectively has a well-founded fear of persecution upon return to Lebanon. Indeed, we have no information to indicate how someone in the respondent's circumstances would be treated by the Lebanese Government, or that the influence of Syria would be determinative of this issue.

The respondent challenges the Immigration Judge's reliance on country reports provided by the Department of State. We see no error and emphasize that the Immigration Judges and the Board frequently rely on such information. *See Matter of V-T-S-*, 21 I&N Dec. 792, 799 (BIA 1997); *see also Koliada v. INS*, 259 F.3d 482, 487-88 (6th Cir. 2001) (noting that State Department profiles are entitled to significant deference, but also acknowledging that the profile in that case was prepared specifically for the Immigration and Naturalization Service). In the instant case, the respondent has presented no meaningful argument to show that the State Department reports utilized by the Immigration Judge were unreliable. We note as well that the Immigration Judge did acknowledge that both parties' evidence indicated that Lebanon has a poor human rights record.

Finally, the respondent argues that he should receive asylum on a strictly "humanitarian basis." Asylum cannot be granted for any reason other than those prescribed by section 208(a) of the Act, so this argument will not be further addressed.

We conclude that the respondent did not meet his burden of proof for asylum, and it follows that he did not meet the higher standard for withholding of removal.[14]  *See Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The Immigration Judge's denial of his application will therefore not be disturbed.

On appeal, the respondent asserts that he should have been granted relief under the Convention Against Torture. However, he fails to address the Immigration Judge's finding that he was not pursuing this form of relief. The Immigration Judge's determination was correct, as the respondent did not indicate in his asylum application that he was requesting relief under the Convention Against Torture. Accordingly, there is no request ripe for review.

## D. Voluntary Departure

As explained above, the breach of the protective order disqualifies the lead respondent from discretionary relief, and we find that he is precluded from

---

[14] We need not address the specific adverse credibility findings made by the Immigration Judge in the context of denying asylum because the application was properly denied for the aforementioned reasons. Moreover, as no challenges have been raised to the Immigration Judge's findings regarding the 1-year filing requirement and the firm resettlement bar, these issues will not be further addressed.

seeking voluntary departure. The Immigration Judge alternatively held that the respondents did not establish statutory eligibility for voluntary departure under section 240B(b) of the Act, 8 U.S.C. § 1229c(b) (2000). We affirm the Immigration Judge's decision in this regard. We do not find that the respondents have meaningfully addressed this issue on appeal.

We only separately note that the respondents assert that they were not adequately advised of the possibility of "prehearing" voluntary departure under section 240B(a) of the Act, and that a remand is in order under *Matter of Cordova*, 22 I&N Dec. 966 (BIA 1999). We disagree. In *Matter of Cordova*, we held that if the evidence of record does not indicate that an alien has been convicted of an aggravated felony or other applicable crime, the Immigration Judge has the duty to provide him or her with information about voluntary departure under section 240B(a) of the Act before the pleadings are taken. This form of voluntary departure has no good moral character requirement, and the respondent must concede removability, file no other applications for relief, and waive appeal. 8 C.F.R. § 1240.26(b)(1).

In the instant case, it is not apparent that the Immigration Judge advised the respondents about prehearing voluntary departure at their master calendar hearing. However, assuming this omission occurred, the respondents have failed to show any resulting prejudice. *See generally Matter of Santos*, 19 I&N Dec. 105 (BIA 1984). Specifically, they do not state that they would have applied for prehearing voluntary departure if notified, which would have prevented them from seeking asylum and withholding of removal, forms of relief that they continue to pursue on appeal. In this regard, the respondents' situation is distinguishable from that of the alien in *Matter of Cordova, supra*. In that case, the alien withdrew his pending application for relief at the hearing and did not pursue its denial on appeal, where he only raised issues related to voluntary departure. In the instant case, the respondents provide no reason to believe that they would have taken the course of action necessary for prehearing voluntary departure even if properly advised.

The request for voluntary departure was properly denied, and there is no reason to remand the record on this issue.

## VII. CONCLUSION

We conclude that the respondents are removable as charged, and that they did not establish eligibility for relief from removal. Accordingly, the appeal will be dismissed.

**ORDER:** The appeal is dismissed.