# In re D-J-, Respondent

*Decided April 17, 2003*

U.S. Department of Justice
Office of the Attorney General

(1)  The Attorney General has broad discretion in bond proceedings under section 236(a) of the Immigration and Nationality Act, 8 U.S.C. § 1226(a) (2000), to determine whether to release an alien on bond.

(2)  Neither section 236(a) of the Act nor the applicable regulations confer on an alien the right to release on bond.

(3)  In determining whether to release on bond undocumented migrants who arrive in the United States by sea seeking to evade inspection, it is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations and the release of undocumented alien migrants into the United States without adequate screening**.**

(4)  In bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, Immigration Judges and the Board of Immigration Appeals shall consider such interests.

(5)  Considering national security grounds applicable to a category of aliens in denying an unadmitted alien's request for release on bond does not violate any due process right to an individualized determination in bond proceedings under section 236(a) of the Act.

(6)  The denial of the respondent's release on bond does not violate international law.

(7)  Release of the respondent on bond is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of the respondent and other similarly situated undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002; further, the respondent failed to demonstrate adequately that he does not present a risk of flight if released and should be denied bond on that basis as well.

## IN BOND PROCEEDINGS

The respondent is an undocumented alien from Haiti who was taken into custody and detained by the Immigration and Naturalization Service ("INS") on October 29, 2002, while attempting to evade lawful immigration procedures and enter the United States illegally. He arrived aboard a vessel that sailed into Biscayne Bay, Florida, on that date, carrying 216 undocumented aliens from Haiti and the Dominican Republic. He and other passengers on the vessel were apprehended ashore after the vessel sought to

evade coastal interdiction by the United States Coast Guard and after many of the aliens sought to evade law enforcement authorities ashore. *See* INS Brief in Support of Bond Appeal, Exh. A ("INS Brief"). Respondent was placed in removal proceedings and charged as being an inadmissible alien under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2002) ("INA"). He is now seeking asylum in the United States and has applied for bond, which would allow his release into the community pending disposition on removal or asylum.

On November 6, 2002, an Immigration Judge ("IJ") granted respondent's application for release on bond (set at $2,500) over the objections of the INS. The INS argued, inter alia, that the release of respondent, and of other members of the undocumented migrant group of October 29, would stimulate further surges of such illegal migration by sea and threaten important national security interests. The INS then appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA dismissed the appeal, concluding, inter alia, that the broad national interests invoked by INS were not appropriate considerations for the IJ or the BIA in making the bond determination, "[a]bsent contrary direction from the Attorney General." Decision of the Board of Immigration Appeals, *In re D-J-*, at 2 (March 13, 2003) ("BIA Dec."). Exercising authority transferred to the Department of Homeland Security ("DHS") by the Homeland Security Act of 2002 ("HSA"), and pursuant to the provisions of 8 C.F.R. § 1003.1(h)(1)(iii), the Under Secretary for Border and Transportation Security has now referred the BIA's decision to me for review.[1] This referral automatically stayed the BIA's order pending my decision. *See* 8 C.F.R. § 1003.19(i)(2).

On February 12, 2003, the IJ denied respondent's application for asylum. His appeal of that decision is pending before the BIA.

Although authority to enforce and administer the INA and other laws related to the immigration and naturalization of aliens has recently been transferred to the Secretary of Homeland Security by the HSA, the Attorney General retains his authority to make controlling determinations with respect

---

[1] On March 1, 2003, the INS was transferred from the Department of Justice to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2178. The Executive Office for Immigration Review, however, remains in the Department of Justice. On February 28, 2003, the Attorney General published a technical rule that moved 8 C.F.R. § 3.1(h) (2002) to 8 C.F.R. § 1003.1(h). *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9332 (Feb. 28, 2003) (to be codified at 8 C.F.R. § 1003.1(h)). The authority of the INS Commissioner to refer Board decisions to the Attorney General is now vested in the Secretary of Homeland Security, or in "specific officials of the Department of Homeland Security designated by the Secretary with the concurrence of the Attorney General." 8 C.F.R. § 1003.1(h)(iii).

to questions of law arising under those statutes.[2] This statutory framework is consistent with the Attorney General's traditional role as the primary interpreter of the law within the Executive Branch. *See generally* 28 U.S.C. §§ 511-13 (2000).

Pursuant to the authority and discretion vested in me under the provisions of section 236(a) of the INA, 8 U.S.C. § 1226(a) (2000),[3] I have determined that the release of respondent on bond was and is unwarranted due to considerations of sound immigration policy and national security that would be undercut by the release of respondent and other undocumented alien migrants who unlawfully crossed the borders of the United States on October 29, 2002. I further determine that respondent has failed to demonstrate adequately that he does not present a risk of flight if released on bond and that he should be denied bond on that basis as well. *See* 8 C.F.R. § 236.1(c)(8) (2002). Accordingly, I order that the BIA's decision and order be vacated, and that respondent be denied bond and detained pending appropriate disposition and proceedings respecting his status under the immigration laws.

---

[2] *See* section 103(a)(1) of the INA, 8 U.S.C. § 1103(a)(1), *as amended by* Homeland Security Act of 2002 Amendments, Division L of Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 531 (2003), which provides:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

[3] Section 1102 of the HSA, 116 Stat. at 2274, added a new subsection (g) to section 103 of the INA, providing as follows:

> The Attorney General shall have such authorities and functions under this Act and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

The Attorney General's authority to detain, or authorize bond for aliens under section 236(a) of the INA is one of the authorities he retains pursuant to this provision, although this authority is shared with the Secretary of Homeland Security because officials of that department make the initial determination whether an alien will remain in custody during removal proceedings. *See* sections 103(a), (g) of the INA, *as amended*; 8 C.F.R. §§ 236.1(c), (d), 287.3(d) (2002).

I.

My review of the BIA's decision in this case is *de novo*; it is not confined to reviewing the decisions of the BIA or the IJ for legal or factual error. *See Deportation Proceedings of Joseph Patrick Thomas Doherty*, 12 Op. O.L.C. 1, 4 (1988) ("[W]hen the Attorney General reviews a case pursuant to 8 C.F.R. § 3.1(h), he retains full authority to receive additional evidence and to make de novo factual determinations."). In making their decisions in this matter, both the IJ and the BIA were exercising limited authority that is dependent upon delegation from the Attorney General. *See id.* at 4. When I undertake review of such decisions pursuant to a referral under 8 C.F.R. § 1003.1(h), the delegated authorities of the IJ and BIA are superseded and I am authorized to make the determination based on my own conclusions on the facts and the law. The recent promulgation of 8 C.F.R. § 1003.l(d)(3), which precludes the BIA from engaging in de novo review of an IJ's findings of fact, does not affect the de novo standard articulated in *Doherty* because that regulation does not govern the authority of the Attorney General to review BIA decisions.

I now turn to the question of whether respondent should have been detained or released on bond under the authority of section 236(a) of the INA.

II.

A.

The law governing the detention or release of aliens such as respondent (i.e., aliens arrested and detained pending a decision on removal) is set forth in section 236(a) of the INA. It provides that the Attorney General may (1) continue to detain the alien; or (2) release the alien on bond or conditional parole. *See* section 236(a) of the INA.[4] Conditional parole is not placed in issue here, so the only question is whether the respondent should be detained or released on bond.

As recognized by the Supreme Court, section 236(a) does not give detained aliens any *right* to release on bond. *See Carlson v. Landon*, 342 U.S. 524, 534 (1952). Rather, the statute merely gives the Attorney General the authority to grant bond *if* he concludes, in the exercise of broad discretion, that the alien's release on bond is warranted. The extensive discretion granted the Attorney General under the statute is confirmed by its further provision that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." Section 236(c) of the INA. Even apart from that provision, the courts have consistently recognized that the Attorney General has extremely broad discretion in

---

[4] *See supra* n.3.

determining whether or not to release an alien on bond under this and like provisions. *E.g.*, *Carlson*, 342 U.S. at 540; *United States ex rel. Barbour v. District Dir. of INS*, 491 F.2d 573, 577-78 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). Further, the INA does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien pending a decision on asylum or removal. *See, e.g.*, *Carlson*, 342 U.S. at 534 (Attorney General's denial of bail to alien is within his lawful discretion as long as it has a "reasonable foundation"); *Barbour*, 491 F.2d at 578 (INS finding that alien was a threat to national security warranted denial of bond, applying "reasonable foundation" standard); *see also Sam Andrews' Sons v. Mitchell*, 457 F.2d 745, 748 (9th Cir. 1972) (Attorney General's exercise of discretionary authorities under the INA must be upheld if they are founded "on considerations rationally related to the statute he is administering").

Further discretionary authority for the release on bond of aliens such as respondent is found in subpart A, section 236.1 of the INS regulations governing "Detention of Aliens Prior to Order of Removal." *See* 8 C.F.R. § 236.l(c)(8). This regulation provides:

> Any officer authorized to issue a warrant of arrest *may, in the officer's discretion*, release an alien not described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.

*Id.* (emphasis added). This provision gives the DHS discretionary authority to release a covered alien on bond if, and only if, the alien makes a satisfactory demonstration with respect to the stated criteria. Like section 236(a), it does not establish any right to release on bond.

### B.

I will now briefly summarize the pertinent facts and contentions of the parties indicated in the record.

As noted above, respondent arrived off the shores of Florida in an overloaded vessel with 216 undocumented aliens from Haiti and the Dominican Republic on October 29, 2002. After the vessel sought to evade the orders and interdiction efforts of a U.S. Coast Guard ("USCG") vessel, some of the alien passengers jumped from the vessel and swam ashore. After the migrant vessel ran aground, the remaining passengers disembarked and, despite the order of USCG officers to stop, ran ashore and fled from law enforcement officers before they were apprehended. *See* INS Brief, Exh. A (Declaration of Captain Mark J. Kerski, USCG) ("Kerski Declaration"). I find nothing in the record showing that respondent was not among the alien

migrants who disobeyed the orders of, and sought to evade, USCG or law enforcement officers ashore in an effort to enter the United States unlawfully.

The respondent offered limited evidence and information in the proceedings below in support of his claims that he did not present a danger to the community, a risk of flight, or a threat to national security. Respondent testified that he has not been arrested or convicted of a crime; and that, if released, he would live with an uncle residing in New York, New York, who would provide him with food, shelter, and transportation while he applied for asylum. Memorandum Decision of the Immigration Judge, *In re D-J-*, at 2 (Dec. 12, 2002) ("IJ Dec.").

Respondent's brief before the BIA asserts that he was "willingly taken into INS custody." Respondent's Brief in Support of the Immigration Judge's Custody Determination at 3 ("Respondent's Brief"). That assertion, however, does not address whether the respondent was among the migrants who sought to evade USCG and other law enforcement officers after coming ashore, as indicated in the USCG's Kerski Declaration. Respondent's brief further asserts that, because he does not speak or understand English, he could not be expected to obey any orders from English-speaking law enforcement officers at the time he came ashore. That assertion, however, does not address the likelihood, indicated by the content of the Kerski Declaration, that the circumstances in which those orders were issued were such that their meaning would have been clear in context, without regard to the particular words uttered by the officers. *See* INS Brief, Exh. A, ¶¶ 4-6.

In opposing respondent's contentions, the INS submitted declarations from officers of the Coast Guard, the Department of State, and the Department of Defense ("DOD") as exhibits before the IJ and the BIA.[5] INS maintains that these declarations show that there are strong concerns of national security requiring the continued detention of the respondent and similarly situated undocumented migrants pending removal proceedings. Two general areas of concern are implicated. First, there is a concern that the release of aliens such as respondent and the other October 29 migrants would tend to encourage further surges of mass migration from Haiti by sea, with attendant strains on national and homeland security resources. Such mass migrations would also place the lives of the aliens at risk. Second, in light of the terrorist attacks of September 11, 2001, there is increased necessity in preventing undocumented aliens from entering the country without the screening of the immigration inspections process.

---

[5] The exhibits submitted with the INS brief included: Declaration of Captain Mark J. Kerski, USCG (Exhibit A); Memorandum from the United States Department of State (Exhibit B); Declaration of Captain Kenneth A. Ward, USCG (Exhibit C); Declaration of Johnny Williams (Exhibit D); Supplemental Declaration of Captain Kenneth A. Ward, USCG (Exhibit E); and Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations (Exhibit F).

The first area of national security concern advanced by INS is the threat of further mass migration. INS asserts that reports and rumors of successful entry into the United States by Haitian migrants have fueled recent migration surges and the perception of further successful entries could encourage further mass migration attempts.[6] In support of this contention, INS has submitted a memorandum issued by the State Department supporting detention of the migrants who landed in Florida on October 29, 2002, in order to prevent further mass migrations. The memorandum states in relevant part:

> The disposition of those detained in the October 29 arrival will spur further migration if they are released into the U.S. Such treatment would create a perception in Haiti of an easing in U.S. policy with respect to admission of migrants. For this reason, the Department of State strongly recommends that the 216 migrants (207 Haitians, 9 Dominicans) from the boat which reached Key Biscayne on October 29 be detained while they undergo processing. The migrants should be detained unless and until they demonstrate a well-founded fear of persecution. Those who cannot do so should continue to be held, absent a compelling humanitarian reason for release, until they can be expeditiously repatriated.

INS Brief, Exh. B (State Department Memorandum). The State Department memorandum sets forth extensive and detailed information documenting the relationship between perceptions in Haiti of successful U.S. entry by seagoing migrants and the likelihood of further mass migrations. *Id.*

The declarations submitted from the Coast Guard (*see supra* n.6) and the Defense Department express corroborating statements regarding this concern. The Coast Guard states that "[a]necdotal reporting and operational experience strongly suggests that detaining and swiftly repatriating those who illegally and unsafely attempt to enter the United States by sea is a significant deterrent to surges in illegal immigration and mass migration." INS Brief, Exh. C, ¶ 9 (Declaration of Captain Kenneth A. Ward, USCG). Similarly, the Department of Defense declaration states that "[a]ctual or even *perceived* changes in U.S. immigration policy can trigger mass migration events by encouraging other potential illegal migrants." *See* INS Brief, Exh. F, ¶ 5 (Declaration of Joseph J. Collins, Deputy Assistant Secretary of Defense for Stability Operations).

The INS submissions also outline an additional national security implication of encouraging future mass migrations by sea from Haiti. The Coast Guard declaration asserts that continued mass migrations from Haiti have "heavily taxed Coast Guard capacity and capabilities," while "reducing

---

[6] Following the successful landing of more than 200 Haitians on October 29, 2002, on November 7, 2002, and again on November 9, 2002, the USCG successfully interdicted three groups of undocumented Haitian migrants attempting to transit to the United States via the Bahamas. In all, 264 Haitian migrants were interdicted on these dates. Such incidents are "typical of a surge in Haitian migrant departures following similar successful landings and demonstrates the 'pull' factor that successful landing can have." INS Brief, Exh. E, ¶ 3 (Supplemental Declaration of Captain Kenneth A. Ward, USCG).

responsiveness in other mission areas." INS Brief, Exh. C, ¶ 7. The Department of Defense, which is also involved in efforts to contain such overseas migrations, also asserts that the demands of mass migrations from Haiti "would create a drain on scarce assets that are being used in or supporting operations elsewhere." INS Brief, Exh. F, ¶ 8.

The declarations submitted by INS also substantiate a national security concern raised by the prospect of undocumented aliens from Haiti being released within the United States without adequate verification of their background, associations, and objectives. Thus, the State Department declaration asserts that it has "noticed an increase in third country nations (Pakistanis, Palestinians, etc.) using Haiti as a staging point for attempted migration to the United States. This increases the national security interest in curbing use of this migration route." INS Brief, Exh. B, ¶ 11. Relatedly, the Coast Guard's supplemental declaration asserts that the boatloads of interdicted Haitians have included persons previously deported for drug trafficking and subject to outstanding felony warrants. INS Brief, Exh. E, ¶ 4 (Supplemental Declaration of Captain Kenneth A. Ward, USCG). The Coast Guard further asserts that "because maritime migrants are typically undocumented and carry little or no identification, it is often difficult to ascertain the identity and background of interdicted persons, particularly in large groups, which presents potential threats to officer safety, as well as national security." *Id.*

## III.

Having considered the record and the briefs of the parties, and exercising my authority under section 236(a) of the INA, I have determined that the release of respondent on bond is unwarranted.

I conclude that releasing respondent, or similarly situated undocumented seagoing migrants, on bond would give rise to adverse consequences for national security and sound immigration policy. As demonstrated by the declarations of the concerned national security agencies submitted by INS, there is a substantial prospect that the release of such aliens into the United States would come to the attention of others in Haiti and encourage future surges in illegal migration by sea. Encouraging such unlawful mass migrations is inconsistent with sound immigration policy and important national security interests. As substantiated by the government declarations, surges in such illegal migration by sea injure national security by diverting valuable Coast Guard and DOD resources from counterterrorism and homeland security responsibilities. Such national security considerations clearly constitute a "reasonable foundation" for the exercise of my discretion to deny release on bond under section 236(a). *See Carlson*, 342 U.S. at 534; *Barbour*, 491 F.2d at 578.

I have noted the BIA's suggestion that the INS's recent adoption of a policy placing certain aliens (including many undocumented aliens who arrive by sea and are not admitted or paroled) in expedited removal proceedings in which affected aliens, with limited exceptions, would be automatically detained without review by an IJ or the BIA tends to negate the INS's concern regarding the encouragement of migration surges. BIA Dec. at 2 n.3; *see* Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924-26 (Nov. 13, 2002). The offsetting effect suggested by the BIA would presumably be due to the prospect that the new expedited removal policy will be so restrictive that potential Haitian migrants would learn of that and be deterred from future migration attempts, regardless of respondent's fate and that of the other October 29 migrants. While the expedited removal policy may reduce the incidence of seagoing Haitian migrants being released on bond pending removal, it hardly provides airtight assurance against future successful entries by such migrants through legal and extra-legal maneuvers, or the encouragement of additional maritime migrations likely to arise from such entries. I note, for example, that the policy's strict detention provision is entirely inapplicable to aliens who are admitted or paroled. In any event, even if the new policy somewhat reduced the expectations of further successful U.S. entries, the release of respondent and hundreds of others from the October 29 migrant group would strongly undercut any resultant deterrent effect arising from the policy. The persistent history of mass migration from Haiti, in the face of concerted statutory and regulatory measures to curtail it, confirms that even sporadic successful entries fuel further attempts. I therefore am not persuaded that the new expedited removal policy negates the migration "surge" consideration.

I further conclude that the release on bond of undocumented seagoing migrant aliens from Haiti without adequate background screening or investigation presents a risk to national security that provides additional grounds for denying respondent's release on bond. This consideration is fortified by the State Department's assertion that it has observed an increase in aliens from countries such as Pakistan using Haiti as a staging point for migration to the United States. Under the current circumstances of a declared National Emergency, the Government's capacity to promptly undertake an exhaustive factual investigation concerning the individual status of hundreds of undocumented aliens is sharply limited and strained to the limit. Under these circumstances, it is reasonable to make a determination that aliens arriving under the circumstances presented by the October 29 influx should be detained rather than released on bond. There is substantial risk that granting release on bond to such large groups of undocumented aliens may include persons who present a threat to the national security, as well as a

substantial risk of disappearance into the alien community within the United States.

I note that the BIA has acknowledged the seriousness of INS's arguments that the detention or release of these aliens implicates important national security interests. *See* BIA Dec. at 2. The BIA determined, however, that such considerations fall "outside the scope of Immigration Judge bond proceedings as such proceedings are currently constituted," except where individual considerations show that the respondent is not likely to appear or presents a danger to the community. The BIA then stated: "Absent contrary direction from the Attorney General, we therefore agree with the Immigration Judge's focus on the respondent's individual likelihood to appear and individual danger to the community." *Id.* This opinion provides the BIA and Immigration Judges with the "contrary direction" to which the BIA referred. In future proceedings involving similarly situated aliens, this opinion constitutes binding precedent, requiring the BIA and IJs to apply the standards set forth herein, including consideration of national security interests. *See generally Iran Air v. Kugelman*, 996 F.2d 1253, 1260 (D.C. Cir. 1993) (administrative judges "are entirely subject to the agency on matters of law"). Further, in all future bond proceedings involving aliens seeking to enter the United States illegally, where the Government offers evidence from sources in the Executive Branch with relevant expertise establishing that significant national security interests are implicated, IJs and the BIA shall consider such interests.

Finally, I conclude that respondent has not individually demonstrated that he satisfies the prerequisites to discretionary release on bond under the provisions of 8 C.F.R. § 236.l(c)(8). INS may (but is not required to) grant release under that provision if the alien demonstrates to its satisfaction that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding. I do not find that respondent has adequately demonstrated that he is likely to appear at future proceedings for purposes of granting release on bond pursuant to section 236(a)(2) of the INA or 8 C.F.R. § 236.l(c)(8). There are strong indications in the record that respondent was among those aliens who sought to evade Coast Guard and law enforcement officers in a determined effort to effect illegal entry into the United States. Because such evasive behavior does not provide reassuring evidence of respondent's likely reliability in appearing for future proceedings, it was incumbent upon respondent to produce substantial countervailing evidence as to that criterion. I conclude that the minimal showing made by respondent on this point was insufficient to demonstrate the likelihood of his appearance for future proceedings.[7]

---

[7] The INS also offered evidence disputing respondent's claim that, individually, he does not

(continued...)

In addition, I note that the respondent was denied asylum by the Immigration Judge on February 12, 2003. The respondent appealed that decision to the BIA on March 14, 2003, and that appeal remains pending. The IJ's denial of the respondent's application for asylum increases the risk that the respondent will flee if released from detention. "A respondent with a greater likelihood of being granted relief from deportation has a greater motivation to appear for a deportation hearing than one who, based on a criminal record or otherwise, has less potential of being granted such relief." *Matter of Andrade*, 19 I&N Dec. 488, 490 (BIA 1987).

## IV

Although neither the IJ nor the BIA chose to address the issue, respondent contends that he is constitutionally entitled on due process grounds to an "individualized determination" of his request for release on bond and that denying bond on broad national security grounds that are generally applicable to the October 29 migrants would somehow violate such a right. Respondent's Brief at 6-8. In that regard, I note that several federal appellate courts have recently held that a *lawful permanent resident alien* has a due process right to an individualized hearing and determination on whether he poses a risk of flight or a danger to the community when subjected to the mandatory detention provisions of section 236(c) of the INA. *See Kim v. Ziglar*, 276 F.3d 523 (9th Cir.), *cert. granted sub nom. Demore v. Hyung Joon Kim*, 536 U.S. 956 (2002); *Patel v. Zemski*, 275 F.3d 299, 314-15 (3d Cir. 2001); *see also Hoang v. Comfort*, 282 F.3d 1247, 1256 (10th Cir. 2002). Another federal appeals court has reached a contrary conclusion on that issue, *see Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999), and the Supreme Court has granted the Government's petition for a writ of certiorari and heard oral argument in *Kim.*

I first note that the decisions in *Kim* and *Patel* were specifically addressed to the *mandatory* detention provisions of section 236(c) of the INA and are therefore fundamentally distinguishable from the procedures afforded under section 236(a). Section 236(c) requires nondiscretionary detention as a categorical statutory mandate for those aliens covered by it, whereas section 236(a) affords aliens to whom it applies the opportunity to seek discretionary relief (bond or conditional parole) in a hearing before an Immigration Judge. *See Kim*, 276 F.3d at 533.

More significantly, however, the holdings in *Kim* and *Patel* were premised upon the petitioner's status as a lawful permanent resident alien. *See Kim*, 276 F.3d at 528, 534; *Patel*, 275 F.3d at 307. In contrast, respondent has not

---

[7] (...continued)

pose a danger to the community and is likely to appear in future proceedings. *See* INS Brief at 14-15.

even been admitted to the United States, let alone acquired the status of a lawful permanent resident alien. Respondent's status is that of an undocumented alien, charged as being inadmissible as an alien present in the United States without having first been admitted or paroled. *See* section 212(a)(6)(A)(i) of the INA. As an alien who has "not yet gained initial admission to the United States," he does not qualify for the limited due process protection extended to "admitted" aliens under the sharply distinguishable circumstances presented in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001) ("We deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question."). As explained by the court in *Gisbert v. United States Attorney General*, 988 F.2d 1437, 1440 (5th Cir.), *amended on other grounds*, 997 F.2d 1122 (5th Cir. 1993): "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Accord United States v. Lopez-Vasquez*, 227 F.3d 476, 484-85 (5th Cir. 2000); *Zheng v. INS*, 207 F.Supp.2d 550, 552 (E.D. La. 2002) ("The detention of aliens who have been denied initial admission into the United States does not implicate the Fifth Amendment, even if such aliens were subsequently paroled or released within the country.").

Even if the respondent *were* entitled to an individualized hearing, however, such a conclusion would not support a contention that this respondent's request for release on bond must be determined exclusively on the basis of his individual situation, rather than on the basis of general considerations applicable to a category of migrants, as a matter of constitutional due process. The mere fact that general considerations are introduced does not negate the individual nature of the hearing. The Attorney General is broadly authorized to detain respondent, and deny his request for bond, based on any reasonable consideration, individualized or general, that is consistent with the Attorney General's statutory responsibilities. *See Reno v. Flores*, 507 U.S. 292, 313-14 & n.9 (1993) (rejecting juvenile aliens' demands for an "individualized custody hearing" and upholding INS use of "reasonable presumptions and generic rules" in such cases).

In any event, I have given full consideration to the individual aspects of respondent's claim for bond based on the record in this proceeding. I find nothing in respondent's individual case that warrants granting him release on bond when balanced against the above-described compelling factors that militate against such release in the case of undocumented aliens attempting illegal entry into the United States under the circumstances presented by the October 29 influx.

Finally, I note that respondent argued to the BIA that an INS policy of detaining Haitian migrants in order to deter other Haitians from migrating to the United States seeking asylum violates international law. *See* Respondent's Brief at 8-9. In support of his argument, he invokes the right to asylum protected by Article 14 of the Universal Declaration of Human Rights ("UDHR") and an advisory opinion of the United Nations High Commission for Refugees stating that "asylum seekers should not be detained for purposes of deterrence." *Id.* at 8. The BIA did not address respondent's arguments on this point in its decision.

This argument is without merit. First, the UDHR is merely a nonbinding expression of aspirations and principles, rather than a legally binding treaty. *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 816 n.17 (D.C. Cir. 1987) (UDHR "is merely a nonbinding resolution, not a treaty"). In any event, the application of U.S. law to protect the nation's borders against mass migrations by hundreds of undocumented aliens violates no right protected by the UDHR or any other applicable rule of international law. As the Supreme Court has recognized, "'[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments . . . .'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). The authority to expel aliens is meaningless without the authority to detain those who pose a danger or a flight risk during the process of determining whether they should be expelled. The national security interests invoked in this opinion are directed at unlawful and dangerous mass migrations by sea, not the right to seek asylum. Aliens who do arrive in the United States, including the respondent himself, are afforded the right to apply for asylum and have those applications duly considered.[8]

---

[8]  I note that a regional official of the United Nations High Commissioner for Refugees ("UNHCR") has sent me a letter volunteering certain comments on this proceeding. Letter for The Honorable John Ashcroft, Attorney General of the United States, from Guenet Guebre-Christos, Regional Representative, United Nations High Commissioner for Refugees, *Re: Matter of D-J-*, *Advisory Opinion on Detention of Asylum Seekers* (March 28, 2003). In brief, the UNHCR letter makes certain arguments invoking purported obligations arising under the 1967 Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 (Jan. 31, 1967) ("Protocol"), and the 1951 United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (1954), 19 U.S.T. 6259, 6278, T.I.A.S. No. 6577 (1968) ("Convention"). The United States is not a party to the Convention, but it is a party to the Protocol, which incorporates by reference Articles 2 through 34 of the Convention. The Protocol is not self-executing, but Congress has incorporated into the INA, through the Refugee Act of 1980, the appropriate requirements of the Protocol. Consequently, the Protocol does not afford respondent any rights beyond what he is afforded under the federal immigration laws, as applied in this decision. *See Abdelwahed v. INS*, 22 Fed.Appx. 811, 815, 2001 WL 1480651 (9th Cir. 2001) (stating that "the Protocol does not give [the petitioner] any rights beyond what he already enjoys under the immigration statutes"); *Legal Obligations of*

(continued...)

CONCLUSION

I have determined that respondent's release on bond under the provisions of section 236(a) of the INA is unwarranted. The BIA's Order of March 13, 2003, is hereby vacated and respondent is to be detained pending decision on removal.

---

[8] (...continued)

*the United States under Article 33 of the Refugee Convention*, 15 Op. O.L.C. 86, 87 (1991) ("[T]he Protocol by which the United States adhered to the Convention is not self-executing for domestic law purposes. Accordingly, the Protocol itself does not create rights or duties that can be enforced by a court.").